## BANK OF OVERTON v. THOMPSON.

(Circuit Court of Appeals, Eighth Circuit. November 3, 1902.)

### No. 1,671.

1. KNOWLEDGE OF AGENT AS NOTICE TO PRINCIPAL—ADVERSE INTEREST OF AGENT.

The rule that knowledge possessed by an agent while transacting business for his principal is imputable to the principal is based on the presumption that he will communicate such knowledge as his duty requires, and is subject to exception where in the transaction he acts not only for his principal, but also for himself individually, and his interest or conduct is such as to render it certain that he would not make such disclosure.

2. SAME—CASHIER OF BANK.

The cashier of a bank sold cattle in which he and complainant were jointly interested, receiving payment in a draft and credit slip payable to the bank. These he deposited to his own credit, and collected and thereafter checked out the entire amount, and converted it to his own use. He transacted the entire business on behalf of both the bank and himself, and no one else connected with the bank had any knowledge of complainant's interest in the cattle or their proceeds. *Held*, that the bank was not chargeable with notice that complainant had any interest in the fund deposited, and occupied no trust relation to him which rendered it accountable for such interest.

3. PARTNERSHIP—SALE OF PROPERTY BY PARTNER—RIGHT OF COPARTNER TO FOLLOW PROCEEDS.

A contract between an owner of land and his tenant by which the former agreed to furnish money for the purchase of stock to be placed on the land and cared for by the tenant,—the amount to be repaid, with interest, from the proceeds of the stock when sold, and the profit or loss to be divided equally,—created a partnership in the venture; and, on a sale of the stock by the tenant at a price which realized a profit, the landlord had no interest in the specific money received therefor, and no claim against a bank in which it was deposited by the tenant to his own credit on account of such deposit, even though the bank had knowledge or notice of the source from which it was obtained, his only right being to hold his partner to a personal accounting.

Appeal from the Circuit Court of the United States for the District of Nebraska.

The appellant (defendant below) is a banking corporation doing business at Overton, in the state of Nebraska. From some time prior to the year 1897, until October 4, 1899, G. S. Hardinger was its cashier, and had the charge and practical management of its affairs; its president and other directors residing at Lexington, in the same state. On March 1, 1897, the appellee (complainant below), by an agreement in writing, leased to said G. S. Hardinger nearly a section of land in Dawson county, Neb., for the term of three years from that date, and agreed to furnish money to stock the farm with hogs and cattle, as might be agreed on, to consume the pasture and hay on the place. Hardinger agreed to do all the labor on the place, and

¶ 2. See Banks and Banking, vol. 6, Cent. Dig. § 285.

take care of the farm and stock. The title and possession of the stock were to remain in complainant until he was repaid all moneys advanced by him and 7 per cent. interest thereon; and, after such payment and payment of all debts, all profits or losses were to be evenly divided between said complainant 'and said Hardinger. Complainant during the year 1898 advanced and paid out, for 237 cattle placed on the said farm under said agreement, $4,180.36. There was probably some increase of this stock on the farm, and some losses by the death of animals. On July 7, 1899, said Hardinger, having been authorized by complainant to sell the said cattle, made sale of them all, together with about 15 cows to which complainant had no title, to one H. P. Stryker, for the sum of $5,500. Said Stryker obtained the money to pay said Hardinger by a loan to that amount which he obtained from the First National Bank of Lexington, Neb., giving as security therefor his chattel mortgage of said cattle. To be insured that the money so loaned would be applied to the payment for the cattle covered by the chattel mortgage, said First National Bank, with the consent of said Stryker, gave him, instead of cash, its draft on the Omaha National Bank of Omaha, Neb., payable to the order of the Bank of Overton, for $3,000, and a slip or ticket acknowledging that it had credited the Bank of Overton with the sum of $2,497.75, which with the stamps and filing charges for the chattel mortgage, amounted to the sum loaned. Said Hardinger accepted said draft and credit slip as cash from said Stryker in payment for the cattle so sold, and immediately, on the same day, deposited both of them as cash in the defendant bank; taking credit therefor to himself on his individual deposit account in the sum of $4,738.31, and withdrawing from the bank the balance of said draft and credit slip in money. The amount of said draft and of said credit slip was duly received by defendant bank; and said Hardinger, between that date and October 1, 1899, by his checks, withdrew from said bank the entire amount of his said deposit, and of all others which were there to his credit, and, having about the same time embezzled other moneys belonging to said defendant bank, ceased to be its cashier or to be connected with it about October 4, 1899, and has since been insolvent. In receiving said draft and credit slip as cash, and in the collection of each, said Hardinger alone acted for the defendant bank, and was the only officer of that bank, or person connected therewith, who had any knowledge that such draft or credit slip had any connection with the sale of cattle in which complainant had any interest. On August 25, 1899, Hardinger informed complainant by letter that he had sold all the cattle in which they were interested for $5,000; the cattle to be taken between September 15th and 20th. Hardinger never paid complainant anything on account of the money for which the cattle were sold; but complainant afterwards sold hay on the farm in which Hardinger had an interest, and some machinery, and, on account of the same, credited Hardinger $694.70, and brought this action, alleging that Hardinger sold the cattle he was interested in to Stryker for $5,000, and that defendant bank received the proceeds, through said draft and credit slip, knowing the facts, and that it was a trust fund belonging to the complainant, by reason of his ownership of the cattle. Defendant bank, by its answer, denied any knowledge of complainant's transactions with Hardinger, or that complainant had any interest in the money represented by the said draft or credit slip, or that these represented anything but the individual money of Hardinger, and were received as cash belonging to Hardinger, and paid out afterwards to him on his checks by the defendant bank. The circuit court held that the moneys represented by said draft and credit slip, when deposited in defendant bank, were trust moneys belonging to complainant, to the extent of his interest in the same, and that Hardinger's knowledge of the facts was imputable to defendant bank, and rendered its decree in favor of the complainant for the sum of $4,761.31 and costs.

T. J. Mahoney (Marcellus L. Temple, on the brief), for appellant.
A. S. Churchill, for appellee.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

LOCHREN, District Judge, after stating the case as above, delivered the opinion of the court.

1. The question as to whether the books of account of defendant bank were properly admitted in evidence, though much discussed in the briefs of counsel, is not presented by this appeal. The complainant who objected to this evidence does not appeal, and the evidence must be considered as properly admitted.

2. But assuming that the moneys which Hardinger obtained for the cattle sold to Stryker were trust funds, and that complainant had an interest in the specific money represented by the draft and credit slip which Hardinger received from Stryker as cash for the cattle, to the extent of what complainant was entitled to receive on such sale, and that the deposit by Hardinger to his personal credit in his individual deposit account in that bank was a fraud on the complainant, completed by his drawing out the same money by his checks paid by that bank, and by converting the whole to his own use, the defendant bank cannot, on the facts of this case, be charged with any responsibility to the complainant. Aside from Hardinger, no one connected with the bank had any knowledge or notice that the complainant had any interest in the cattle sold to Stryker, or in the proceeds of such sale, or that the deposit by Hardinger in the bank was other than his own moneys, which he had a right to withdraw and use at any time.

But it is claimed on behalf of the complainant that as Hardinger certainly had full knowledge of complainant's interest in the cattle, and in the money for which Hardinger sold them, and as he was the cashier of the defendant bank, when, as such, he took into that bank the deposit made there by himself as an individual depositor, his knowledge of all the facts connected with the rights of the complainant to that money is imputable to that bank, under the well-settled general rule that the knowledge of an agent, or notice to an agent, while acting within the scope of his authority, is notice to his principal, because within that scope he is the alter ego of the principal, and because the law will presume that the agent has performed his duty to disclose to his principal all notice to himself necessary to his principal's protection or guidance. The officer of a corporation, like a cashier of a bank, is such agent. There are, however, well-settled exceptions to this rule, where notice or knowledge on the part of the agent will not be imputed to the principal, and one of these is "where the agent's relations to the subject-matter, or his previous conduct, render it certain that he will not disclose it." Mechem, Ag. § 721. "In such cases the presumption is that the agent will conceal any fact which might be detrimental to his own interests, rather than that he will disclose it." Id. § 723; Koehler v. Dodge, 31 Neb. 329, 336, 47 N. W. 913, 28 Am. St. Rep. 518; Bank v. Sharpe, 40 Neb. 123, 127, 58 N. W. 734; Benton v. Bank (Mo.) 26 S. W. 975; Bank v. Lovitt, 114 Mo. 519, 21 S. W. 825. In the case last cited it is said:

"An officer of a banking corporation has a perfect right to transact his own business at the bank of which he is an officer, and in such transaction his interest is adverse to the bank, and he represents himself, and not the bank. The law is well settled that, when an officer of a corporation is dealing with it in his individual interest, the corporation is not chargeable

with his uncommunicated knowledge of facts derogatory to his title to the property which is the subject of the transaction."

Notwithstanding some dicta and one decision—Bank v. Blake (C. C.) 60 Fed. 78—to the contrary it is fairly well settled that knowledge of an agent, actually concealed from his principal, while the agent is dealing with the principal on his own account, is not to be imputed to the principal, even though the agent, assuming to act as such, did whatever was done on the part of the principal in the transaction with himself, if disclosure of the matter concealed would have had a tendency to defeat his purposes. His position would be as antagonistic to his principal, and his motive for concealment as great as, and easier of accomplishment than, if he were dealing with the principal directly, or with another agent. In Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282, 52 Am. Rep. 710, the court says:

"While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating. Kennedy v. Green, 3 Mylne & K. 699; Cave v. Cave, 15 Ch. Div. 639; In re European Bank, 5 Ch. App. 358; In re Marseilles Extension Ry. Co., 7 Ch. App. 161; Bank v. Harris, 118 Mass. 147; Loring v. Brodie, 134 Mass. 453. One of the most recent cases on this point is Dillaway v. Butler, 135 Mass. 479. A., to whom B. was indebted, advised C. to lend money to B. on the security of a mortgage of personal property, and acted as C.'s agent in completing the transaction. With the money thus obtained, B. paid A. the debt he owed him. Both A. and B. acted in fraud of Gen. St. c. 118, §§ 89, 91, but C. had no knowledge of the fraud. It was held that the knowledge of A. was not, in law, imputable to C., although A. had acted for C. in the negotiation."

In Thomson-Houston Electric Co. v. Capitol Electric Co., 12 C. C. A. 643, 65 Fed. 341; one Dahlgren was the nephew and agent of Mrs. Read, and had $50,000 of her money to loan. He was also the secretary, treasurer, and general manager of the Capitol Electric Company, and had possession of some of its bonds. He, in an indirect way, borrowed $2,250 of this money of Mrs. Read, in his hands, and pledged for its repayment $4,000 of such bonds. It was held that his knowledge of the fraud which he committed in thus misappropriating the bonds was not imputable to Mrs. Read. The court (Taft, Circuit Judge) said:

"We do not think that, under the circumstances of this case, Mrs. Read can be charged with notice of the facts which Dahlgren knew concerning the issue of these bonds. As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him. The Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167. This rule is said to be 'based on the principle of the law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty.' Such presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud the principal. The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it. In Allen v. Railroad Co., 150 Mass. 206, 22 N. E. 917, 5 L. R. A. 716,

15 Am. St. Rep. 185, the plaintiff bought shares of stock in the defendant railway through a broker who was treasurer of the company. He fraudulently filled a blank certificate and delivered it to her. It was sought to impute to her the broker's knowledge of the invalidity of the certificate, in an action by her for damages for refusal to transfer the stock. The court held that this could not be done, because the legal effect of the fraudulent act of the broker was to cheat his principal."

In Bank v. Foote, 12 Utah, 157, 42 Pac. 205, the action was brought by the bank against one Hague, its cashier, and the other defendants, as joint makers of a promissory note to the bank for $3,000. The signatures of the other makers were obtained by Hague upon his agreement that the note should not be used unless it was also signed by one Whitmore, the president of the bank. Without obtaining such signature, Hague negotiated the note, and obtained the money thereon from the bank. The defendants claimed that Hague's knowledge of his own representations to his co-makers was imputable to the bank of which he was cashier. The court said:

"In such a case the representations of Hague to his co-makers were not binding on the bank, and his knowledge of such representations could not be imputed to the bank without violating rules of law well settled both upon principle and authority. Innerarity v. Bank, 139 Mass. 334, 1 N. E. 282, 52 Am. Rep. 710; Mechem, Ag. §§ 723, 729; Frenkel v. Hudson (Ala.) 2 South. 758, 60 Am. Rep. 736; Wickersham v. Zinc Co., 26 Am. Rep. 786. The case of Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698, was referred to and much relied on by appellants. The facts of that case clearly distinguish it from the case at bar. It announces the doctrine that an agent's knowledge of his own fraud is to be imputed to the principal in a transaction where the agent alone represents the principal. This is a distinction which seems to us less substantial than technical, and we cannot give it our assent. The rule of law which imputes the knowledge of an agent to his principal, according to most of the authorities, is based upon the presumption that the agent will communicate to his principal whatever he knows concerning the business he is transacting; and the exceptions to the rule, upon the contrary presumption,— that the agent will not communicate to his principal his knowledge of his own independent frauds, committed in the course of transacting the principal's business, and that he will not communicate to his principal his knowledge in a transaction where he is interested on the opposite side. In a case where the presumption arises that an agent will not communicate his knowledge to his principal, or to another acting for the principal, it would seem to be unreasonable to hold the principal responsible for the knowledge of the agent solely because the agent in the particular transaction appeared himself for the principal. The presumption would naturally be, in such a case, that he would fail to act upon such knowledge as the principal would act, just as he would fail to impart his knowledge in a case where another appeared for the principal."

In the case of Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698, which is criticised in the extract from the case last cited, one Gray was the treasurer of both the plaintiff and defendant companies, and for some time had been embezzling largely from each. To cover his defalcations in the plaintiff company at an expected periodical examination, he had placed with its funds fraudulent checks of the defendant company, which he had drawn payable to the order of plaintiff company, to the amount of more than $200,000, and these were in possession of plaintiff company when the defalcations were discovered. Prior to that no officer of

either company, except Gray, knew anything of such checks. Plaintiff sought to recover on them, as having received them innocently in payment of Gray's indebtedness to it through his defalcations. The court held that as no officer of the plaintiff, save Gray, had acted on its behalf in receiving the checks, the plaintiff was bound by Gray's knowledge of the fraudulent character of the checks, and could not recover. It also placed the decision on the stronger reason, deducible from the real character of the transaction, namely, that the placing of these checks by Gray among the funds of plaintiff was never intended by Gray or any one as a payment of Gray's indebtedness to plaintiff, nor as vesting the title to them in plaintiff, but only as a temporary ruse, to hide Gray's defalcation for the time. The court added that, had Gray intended to pay his indebtedness to plaintiff by thus secretly transferring to it the property of a third person, the plaintiff could not adopt such intention of Gray without adopting the fraud. This is but holding that a principal cannot claim a positive benefit to himself from the fraudulent act of his agent. But suppose that Gray, by placing these fraudulent checks in plaintiff's funds during the examination, had escaped the discovery of his defalcations at that time, and had immediately afterwards taken the same fraudulent checks and indorsed plaintiff's name upon them, and negotiated them and embezzled the proceeds, and defendant company had paid them before discovering their fraudulent character; no one connected with plaintiff company, except Gray, having had any knowledge of the existence of any such checks. Would the fact that Gray had, before negotiating them and embezzling their proceeds, placed them secretly among plaintiff's funds to hide his own frauds, render the plaintiff liable to the defendant for the amount of such fraudulent checks? Would the plaintiff in such case be any more responsible to defendant because of such secret placing of the checks by Gray in plaintiff's funds for his own purposes, and not for plaintiff's benefit, than if Gray as treasurer of defendant company had secretly made the fraudulent checks, and as treasurer of plaintiff company had as secretly indorsed them, and negotiated them without ever putting them with plaintiff's funds?

In the present case, Hardinger, for his own purposes, and without the knowledge of any one else connected with the defendant bank, deposited the proceeds of the sale of the cattle, as his own money, in defendant bank, and, while the facts remained wholly unknown to any one connected with the bank but himself, by his own act he withdrew the same money from the bank. As depositor, both in making and withdrawing the deposit, his interests were adversary to the bank. If he was engaged in defrauding the complainant, the presumption is that he would not disclose to the bank his fraud, or complainant's interest in the fund, and the evidence of the actual fact corresponds to this presumption. The bank had no knowledge of any interest of complainant in the fund, and was under no obligation to him. The complainant, by authorizing Hardinger to sell the cattle, authorized him to receive the money for them and to care for it. In caring for it, he placed it temporarily in defendant bank, but retained, as he properly might, the control over it, and afterwards resumed, as he had a right to, the possession of it. If it was a trust fund, Hardinger

was the complainant's trustee. He might put it in a bank, and remove it at his discretion to another bank, or put it in his pocket.

3. But the money deposited by Hardinger in defendant bank was not, as a whole, nor as to any definite part of it, complainant's money, nor a trust fund of any kind. By the terms of the written agreement between them, complainant and Hardinger became partners in respect to the stock venture. Complainant, on his part, was to furnish the land to subsist the stock, and the money to buy the stock, the nominal title to which he was to retain. Hardinger, on his part, was to care for the stock, cultivate the land, and do or furnish all labor. And the agreement was that, after first repaying the complainant all the moneys he should so furnish, and interest thereon at 7 per cent., all profits or losses were to be divided evenly between them. It was a not uncommon partnership venture. In respect to the sale of the cattle by Hardinger, it matters not that the nominal title to them stood in complainant, as he testified that he authorized Hardinger to sell them, so that Hardinger was not only complainant's authorized agent to make the sale, and incidentally to receive the proceeds, but as partner he had a property interest in such proceeds to the extent of one-half the profits, as the sale was for more than enough to pay complainant's advances and interest; and he had to keep 'and retain the entire proceeds of the sale, his obligation being to account to his partner, the complainant, and to pay him what sum he might be entitled to on such accounting. The suggestion that Hardinger had no right to receive the draft and credit slip, or anything but cash, in payment for the cattle, deserves no consideration. They were equivalent to cash, and complainant ratifies their acceptance by seeking to follow their proceeds. As Hardinger had a substantial interest as partner in the partnership fund, which was the proceeds of the sale of the cattle, and as such partner had the rightful possession of the whole of that fund, his dominion over the particular money constituting that fund was as full and complete as if no one else had any interest in it. If he appropriated the whole of it to his own use, he would not be guilty of embezzlement. State v. Kent, 22 Minn. 41, 21 Am. Rep. 764. If he refused to account for it, his copartner could not replevy or seize the particular money, but could only get a judgment or decree against him for the amount he might show himself entitled to. As Hardinger had rightful control over the money he received for the cattle, and a substantial interest in it, he might use it or deposit it as his own in any bank; and in case of such deposit, even if the banker knew that the money so deposited came from the sale of partnership assets, he would be charged with no duty in respect to other partners. It is needless to consider the fact that Hardinger's sale of cattle to Stryker for $5,500 included cattle owned by Hardinger, and in which complainant neither had nor claims any interest, and which would further affect the accounting in respect to the moneys which Hardinger received on the sale for the cattle, but which would not increase his dominion, which as partner was complete, over the proceeds of the sale.

The complainant has no equities against the defendant, and the decree appealed from is reversed, with costs, and the cause remanded, with directions to dismiss complainant's bill.