INTERSTATE NAT. BANK OF KANSAS CITY, MO., v. YATES CENTER NAT. BANK OF YATES CENTER, KAN., et al.*

(Circuit Court of Appeals, Eighth Circuit.    September 5, 1917.)

No. 4887.

1. PRINCIPAL AND AGENT ⬤⟳177(1)—NOTICE TO AGENT—PRESUMPTIONS.
    The knowledge of an agent is imputed to the principal, on the presumption that the information was communicated by the agent by reason of the relation; but, where the circumstances surrounding the agent are such that he would naturally have concealed his knowledge from the principal, the law will not presume that it was communicated.

2. BANKS AND BANKING ⬤⟳262—KNOWLEDGE OF OFFICIALS—IMPUTATION TO PRINCIPAL.
    Where the president of a bank introduced a stockman to plaintiff, another bank, which was the metropolitan correspondent of the one of which he was president, and induced plaintiff to make loans to him on chattel mortgages, the notes being signed, not only by the stockman, but by the president, the president's knowledge that funds deposited in the bank of which he was an official to the credit of the stockman were the proceeds of sales of mortgaged cattle is not, by reason of his official position, imputable to the bank of which he was president, so as to impress such funds with a trust in favor of plaintiff; it apearing that the president induced the stockman to dispose of the mortgaged cattle without notifying plaintiff, or delivering the proceeds, and was a party to a scheme, with reference to the disposition of the cattle, which, if not criminal, was fraudulent and bordering thereon. ·

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Bill by the Interstate National Bank of Kansas City, Mo., against the Yates Center National Bank of Yates Center, Kan., and Charles D. Hammer, substituted as receiver of the Yates Center National Bank in place of C. A. Korbly. From a judgment dismissing the bill, plaintiff appeals. Affirmed.

---

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied November 19, 1917.

W. F. Guthrie, of Youngstown, Ohio, and C. Angevine, of Kansas City, Kan., for appellant.

Altes H. Campbell, of Iola, Kan., for appellees.

Before HOOK, SMITH, and STONE, Circuit Judges.

STONE, Circuit Judge.   Plaintiff appeals from dismissal of its bill to set aside satisfaction of three mortgages on the ground of fraud, and to have a preference declared as to funds in the hands of the defendant receiver equal in amount to the sum arising from wrongful disposition of the mortgaged property by the mortgagor which had been deposited in appellee bank and checked therefrom by the mortgagor.

The mortgages, satisfaction of which was sought to be set aside, were given by T. C. Ryan to secure the payment of certain notes, and covered cattle.   After these mortgages had been in force for some time, and a small payment had been made thereon, for the purpose of consolidating the balances and securing an additional sum, a single note was given, secured by mortgage, purporting to cover all of the property included in the three mortgages, and thereupon those mortgages were canceled.   Thereafter the plaintiff ascertained that, largely prior to the execution of this last note, the maker thereof had disposed of most of the chattel security at the instigation and procurement of one Ricker, the president of the defendant Yates Center National Bank, and that the funds arising from such disposition had been deposited in that bank with full knowledge, on the part of the president, both of their origin and of the existence of the mortgages.   The bank having passed into the hands of a receiver, and the mortgagor having withdrawn his funds from the bank, this suit seeks to impound the funds coming into the possession of the receiver, equal in amount to the receipts from the cattle, and to secure a preference thereon.

The theory of the bill is that the money came to the bank accompanied by the knowledge of its improper origin, and therefore the bank and its succeeding receiver obtained and held it as trustee for the plaintiff.   It is not disputed that the proceeds from the sold mortgaged cattle were deposited in the bank to Ryan's credit and later drawn out by him; that the president of the bank, Ricker, had, when they were deposited, accurate knowledge of their origin and the existence of the mortgages; and that no other person connected with the bank had any such knowledge until after Ryan had overdrawn his account.   The crux of the case, therefore, is whether or not the knowledge of Ricker was, under these circumstances, the knowledge of the bank.

[1] The basis of imputing knowledge from an agent to a principal is that the principal cannot be heard to deny responsibility for knowledge acquired by his agent, which would affect his principal's business, and which he would naturally communicate to his principal or use for his benefit.   The imputation of knowledge to the principal is but the application of a presumption that the information was communicated by the agent.   Like most presumptions, it is based upon that legal method of working out justice which often is called into action by necessity, to wit, to treat as existent that which normally and naturally

would occur, but which is difficult or impossible of direct proof by the party upon whom the burden of proof rests. If the circumstances surrounding the agent in respect to the knowledge are such that he would naturally conceal it from his principal, the law will not presume, in the absence of proof, that he did the unusual and unnatural thing of communicating it. Nor will it, proof being absent, hold his principal as possessing information he normally would not have.

[2] The high official position in the bank of Ricker, and his actual knowledge, would bind the bank, unless his connection with that knowledge was such as to preclude any theory or presumption of his communicating it to other officials of the bank, or using it for the benefit of the bank. To ascertain the situation of Ricker in this respect the court has carefully read and considered the entire evidence. Ricker was not a witness, and the record is strangely silent as to the cause of his absence. The testimony revealing Ricker's relation to the matter in question was from T. C. Ryan, who executed the notes and mortgages and sold the cattle; Helen F. Ryan, his wife; J. B. Ryan, a member of a stockyard commission company at Kansas City, and not connected with the other Ryans; R. M. Cook, vice president of the plaintiff bank; George S. Hovey, president of the plaintiff bank; and A. H. Gillis, formerly receiver of the defendant bank; numerous exhibits, including the notes, mortgages, account sales, and drafts covering the sale of the cattle; correspondence between Ricker and Mr. Cook or Mr. Hovey; and statements from the books of the two banks, including T. C. Ryan's account. This evidence shows Ricker, as president of a country town bank, introducing to plaintiff, the city correspondent of that bank, T. C. Ryan, who desired to borrow considerable sums of money to enable him to purchase cattle; the knowledge by Ricker, through previous dealings and acquaintance, that Ryan was a ranchman with little unincumbered property; the virtual certification of Ryan's financial worth by joining him as comaker on the notes to plaintiff; the receipt of a commission from the plaintiff for so doing; the apparent performance of some services for plaintiff, as presenting the notes for Ryan's signature, filing one or more of the mortgages for record, and inspecting the cattle covered by the mortgages; the insistence by him that Ryan sell the cattle and appropriate the proceeds without application on the mortgaged indebtedness or notification of the sale to plaintiff (a criminal act on Ryan's part and at a time when he—Ricker—was liable on the notes); Ryan's excuse that Ricker silenced his protest by saying that he was liable on the notes and would pay them; Ryan's dealings with defendant bank, always through Ricker personally, and sometimes involving large sums; the peculiar manner in which Ricker dealt with Ryan's account in the defendant bank, such as debiting it by ticket on April 17th with $2,250, which would have resulted in slight overdraft of Ryan's account, but which was placed to the credit of "C. G. Ricker, Vice President," and so held until July 1st, when it was retransferred to Ryan's account, then heavily overdrawn; the carrying for weeks of checks against the account as cash items without charging them to the account; crediting Ryan's account with $3,500 from a draft for that amount at a time when he was overdrawn more

than $3,200; the carrying as a credit of the above draft from August 9th until October 4th, when it had been refused by the firm upon which it was originally drawn to cover cattle not then shipped, and when the amount was never received until shipment, almost two months later, to another commission firm; the acceptance by Ricker, for the defendant bank, of notes signed, as Ryan testified, some "in my own name and some made by me in my two given names"; notes made to defendant bank through Ricker by Ryan's 12-year old son and by his wife. Ryan claimed he did not know why Ricker had them make notes, or whether the proceeds were credited to him, though he paid his son's note, with the exception of $400.

The evidence referred to, and other on the same line, convince the court either that Ricker was using T. C. Ryan as a tool in working out his nefarious plans against both banks, or that Ricker and Ryan were operating together, in utter disregard of the welfare or safety of the two banks, if indeed they were not moved by a more sinister motive. In any event, Ricker was engaged in reprehensible, if not criminal, conduct toward one or both banks. It cannot be presumed that he would communicate such actions, or the knowledge of the acts of his tool or confederate, Ryan, to any one, much less to his employer, the defendant bank, or that he would use the information to benefit the defendant bank. Therefore his knowledge of Ryan's dealings with the mortgaged cattle cannot be imputed to the bank. Hence neither it nor its receiver can be held as trustee of any proceeds through such sale.

The judgment is affirmed.