### FIRST NAT. BANK OF SILVERTON, COLO., v. MERCANTILE NAT. BANK OF PUEBLO, COLO., et al.

(Circuit Court of Appeals, Eighth Circuit. May 4, 1921.)

#### No. 5609.

1. **Banks and banking ⬅262—National bank bound by acts of managing cashier within scope of cashier's general authority.**

   Where the cashier of a national bank and two subordinate employés, who were subject to discharge by him, constituted the acting board of directors, the remaining directors being nonresidents, the cashier having in fact absolute control and management of its affairs, his acts and knowledge were the acts and knowledge of the bank in dealings with third parties, and it was bound by all his acts as cashier which were within the general scope and power of a cashier.

2. **Banks and banking ⬅262—Liability of national bank for bonds deposited held question for jury.**

   The cashier of defendant national bank, on behalf of himself and his father, the president, made an agreement for purchase of a controlling interest in plaintiff bank, which had a correspondent in the same city as defendant, with which it kept an account and also its certificates of deposit for $60,000. The correspondent also held a much larger amount in securities and bonds for plaintiff for safe-keeping and collection. The day following the stock purchase defendant's cashier, who for more than a year had been in full control of its business, over his signature as such cashier, wrote the cashier of plaintiff, requesting the transfer of plaintiff's account, time deposits, securities, and bonds from its then correspondent to defendant, and when the transfer was made he receipted for the same as cashier of defendant, but made no entry on its books of the bonds so transferred, amounting to $97,000, and later appropriated them and other funds to his own use and absconded. *Held* that proof of such facts was sufficient to require submission to the jury of the question of defendant's liability for the value of the bonds.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Banks and banking ⊙═262—Want of knowledge of transaction by other officers of national bank does not affect authority of cashier to bind bank.**

The fact that other officers of a national bank had no knowledge of the receipt of bonds on its behalf by its cashier for safe-keeping and collection, or the fact that the bank received no benefit because of the unlawful conversion of the bonds by the cashier to his own use, did not affect his authority to receive them for it, nor relieve it from liability to account for them.

In Error to the District Court of the United States for the District of Colorado; John A. Riner, Judge.

Action at law by the First National Bank of Silverton, Colo., against the Mercantile National Bank of Pueblo, Colo., and others. Judgment for defendants, and plaintiff brings error. Reversed.

C. C. Dorsey, of Denver, Colo. (Gerald Hughes, of Denver, Colo., and M. G. Saunders, of Pueblo, Colo., on the brief), for plaintiff in error.

Henry McAllister, Jr., of Denver, Colo. (George E. Tralles, of Denver, Colo., on the brief), for defendants in error.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

SANBORN, Circuit Judge. The First National Bank of Silverton, Colo., the plaintiff below, complains of many alleged errors in the trial of an action which it brought to recover of the Mercantile National Bank of Pueblo, the defendant below, the value of certain bonds and other securities of the par value of $97,000, which the plaintiff alleged it deposited with the defendant for safe-keeping and collection on February 13, 1915, and the defendant had refused to account for or return after due demand and had appropriated to its own use. The defendant answered in effect, so far as the trial here in question is concerned, that no such deposit was made with it, that C. C. Slaughter was at that time the vice president of the plaintiff, and as such he took and misappropriated the bonds and securities in question. The case was tried to a jury. At the close of the trial the court below granted a motion of the defendant to instruct the jury to return a verdict in its favor, and this ruling is the chief of the numerous alleged errors specified.

[1] The main question in the case therefore is: Was the evidence at the close of the trial so conclusively in favor of the defendant that, if it had been submitted to the jury under proper instructions and they had found a verdict for the plaintiff, it would have been the duty of the court below to set it aside because there would have been no substantial evidence to sustain it? In other words, was the evidence such that reasonable men in the exercise of an honest and impartial judgment could properly draw from it no other conclusion than that the defendant was not liable to the plaintiff on account of the securities and bonds, which for convenience will hereafter be termed the bonds. The evidence established these facts without substantial conflict: W. B. Slaughter and C. C. Slaughter, his son, from 1911 to April, 1915, owned a controlling part of the stock of the defendant, and were re-

spectively its president and cashier. They, with Robert Grant, vice president, W. E. Grant, teller, and W. D. Grisard, assistant cashier, were its board of directors. Robert Grant lived in California, owned some stock in the bank, and his son, W. E. Grant, owned 10 shares and was paid a salary of $100 to $125 per month, while Mr. Grisard's salary was small, and he and W. E. Grant were minor employés, subject to the control, direction, employment and discharge of C. C. Slaughter, the cashier. W. B. Slaughter went to Texas to live in the early part of 1914. For a year and a half prior to March, 1915, those who sat at and attempted to act as the board of directors of the bank were C. C. Slaughter, W. E. Grant, and W. D. Grisard. No committee or members of the board, other than C. C. Slaughter, made any examination or investigation of the latter's acts or account with the bank during the two years prior to March, 1915, and he alone had and exercised the absolute management and control of its business during that time. So that when, in February, 1915, the transaction to be considered was had, he was for all business purposes the bank itself in all his acts, sayings, and writings as its cashier, which were within the general scope of the powers of a cashier of the bank, or of any other ministerial officer of such a bank. Hence, in a transaction between C. C. Slaughter as the defendant's cashier and other banks and parties, the defendant may not be heard to deny that the acts and knowledge of this cashier, within the scope of the customary and apparent powers of such an officer of a bank, were its acts and its knowledge. Auten v. United States Nat. Bank, 174 U. S. 125, 148, 19 Sup. Ct. 628, 43 L. Ed. 920; Rankin v. Tygard, 198 Fed. 795, 802, 119 C. C. A. 591.

[2] Prior to February 6, 1915, M. D. Thatcher was the president, and John H. Werkheiser was and until May, 1917, continued to be, the cashier, of the plaintiff. Mr. Thatcher and other members of his family, who followed his direction and advice, owned practically all the stock of that bank, and he controlled the course of action of these members with reference to their stock and directed the management of the business of that bank. On February 6, 1915, C. C. Slaughter, for himself and his father, W. B. Slaughter, made an agreement to buy from Mr. Thatcher and his associates their stock in that bank. Thereupon the parties proceeded to carry out this agreement of purchase; 460 of the 500 shares of stock of the plaintiff were assigned to W. B Slaughter, and 20 shares of it to C. C. Slaughter; and on February 11, 1915, M. D. Thatcher, president, and John H. Thatcher, vice president thereof, resigned, and W. B. Slaughter was elected president and C. C. Slaughter vice president of the plaintiff. They made a partial payment for the stock of this bank, and in April, 1915, after the transactions to be considered, and after the failure on March 29, 1915, of the defendant, they resigned these positions, and the Thatchers again took control and became the officers of the plaintiff. On February 7, 1915, the day after the sale of the stock of the plaintiff was agreed upon, C. C. Slaughter, over his signature as cashier of the defendant, sent a letter to Mr. Werkheiser as cashier of the plaintiff, which contained these statements and requests:

"I was present yesterday afternoon when Mr. M. D. Thatcher wrote you regarding our purchase of the stock of the First National Bank, which letter I presume you will receive in the next three or four days, and he stated it was up to me to write giving instructions in reference to the future handling of this account. I desire to state, naturally, having become the sole owner of the bank, we are very anxious to obtain any benefits possible out of this purchase. Hence I would request that upon receipt of this letter you transfer all of your account you have in the First National Bank [of Pueblo] to the Mercantile National Bank. * * * Hence, do this immediately; also draw your drafts in the future on the Mercantile National Bank. * * * Furthermore, it was the understanding that the last four certificates of deposit of $5,000 you have issued, should be sent to the First National Bank [of Pueblo] and they would pay them, and we would issue our certificates in lieu thereof. Furthermore, about the 21st or 22d of this month you will have another certificate of the First National Bank due, and I would request you send same to us and we will issue our certificate in lieu thereof."

The First National Bank mentioned in this letter was the First National Bank of Pueblo, which had been and was. the correspondent in that city of the plaintiff, and had held its commercial paper, promissory notes, and bonds for safe-keeping, collection, and remittance, and its moneys on deposit with the First National. Bank of Pueblo subject to the plaintiff's order. When this letter was written the First National Bank of Pueblo held for the plaintiff subject to its checks or drafts about $30,000, and it was the money in this account that C. C. Slaughter in the letter quoted above requested Werkheiser,. the cashier of the plaintiff, to cause to be transferred to the defendant. The plaintiff also held twelve certificates of deposit of the First National of Pueblo, of $5,000 each, representing $60,000, six of which are referred to in that letter. The First National Bank of Pueblo also held commercial paper of the plaintiff aggregating $60,000, copies of which, with the receipts of the First National for the originals, the plaintiff had, and the First National of Pueblo also held bonds to the amount of $97,000, for $87,500 of which the plaintiff held the receipt of the First National. The letter of Mr. Thatcher to Mr.. Werkheiser, cashier of the plaintiff, referred to in the letter of Slaughter, as cashier of the defendant, of February 6, 1915, read, so far as it is material here, as follows:

"I have made a sale of the First National Bank of Silverton stock to Mr. W. B. Slaughter. The entire assets of the bank, of every nature, are to be turned over to Mr. W. M. Slaughter, or Mr. C. C. Slaughter, or their representative, whenever they require it."

This letter also contained directions about the transfer of the stock to the Slaughters and the election of new officers. Under date of February 8, 1915, C. C. Slaughter, under the title of cashier of the defendant, wrote Mr. Werkheiser, the cashier of the plaintiff, again to transfer the account of the plaintiff from the First National of Pueblo to the defendant, and added:

"Furthermore, you will also send all receipts and papers that you hold, representing commercial paper that is now held by the First National Bank of Pueblo, aggregating about $60,000, and also the bonds, aggregating something about $90,000, and we will get these papers from the First National Bank and hold same for you, sending the necessary receipts for your files."

Under date of February 11, 1915, Mr. Werkheiser, as cashier of the plaintiff, wrote a letter in reply to C. C. Slaughter, cashier of the Mercantile National Bank, as follows:

"Dear Sir: We inclose all copies of commercial paper; originals are in the hands of the First National Bank, Pueblo, Colo., belonging to this bank: [Here followed a list of promissory notes, aggregating $60,000.] Kindly acknowledge receipt covering same. We also inclose receipts for bonds and stocks from the First National Bank, Pueblo, as follows: [Here followed a list of bonds, aggregating $97,500.] Kindly send us your receipt for the above, or the bonds, as you prefer."

Albert S. Booth was the vice president of the First National of Pueblo in 1913. He testified that he was aware of the sale of the stock of the plaintiff to W. B. Slaughter and C. C. Slaughter when it was agreed upon on February 6, 1915, and that Mr. Thatcher then told him that he could turn the bonds over to them whenever they called for them, and they would probably want to make the Mercantile National the depository, the same as the First National of Pueblo had been. He testified that the latter bank had been holding the commercial paper, bonds, and other securities of the plaintiff for safe-keeping and collection; that on February 13, 1915, C. C. Slaughter came to his office and said that, as they had purchased an interest in the Silverton Bank, the Mercantile Bank would now take the same place as the First National had with reference to these notes, bonds, and securities; that they had arranged for the transfer of the checking account, and the Mercantile National would then take over the commercial paper, and bonds the First National held for the plaintiff; and that he asked for the commercial paper and securities. He testified that, on this request being made by Slaughter as cashier of the defendant, the latter presented and delivered to him copies of the notes owned by the plaintiff for $60,000, on the backs of which his receipts for the originals to the plaintiff as vice president of the First National Bank of Pueblo were written; that Slaughter as cashier presented to him his receipt to the plaintiff as vice president of the First National for all the bonds, excepting $10,000 of them, which had been purchased after the date of the receipt, wrote on that receipt the words: "Received all of the above bonds. C. C. Slaughter, Cashier"—and in addition receipted for each lot of these bonds and the lot of $10,000 that had been bought after the date of the First National's receipt, upon the books of the First National of Pueblo by writing thereon his signature as cashier opposite each lot of these bonds. Asked on cross-examination what order or authority he had from the First National of Silverton, the plaintiff, to deliver the bonds, he answered, referring to Mr. Thatcher's direction of February 6, 1915, to turn over the account and securities held for the plaintiff to the Slaughters whenever they called for them:

"Well, Mr. Thatcher's order was verbal. At that time his resignation had not taken effect."

He further testified on cross-examination that the plaintiff had changed its account to the defendant when he delivered the bonds; that it was understood that he would deliver them on C. C. Slaughter's request; that the fact that his father, W. B. Slaughter, had purchased

the stock of the plaintiff had some effect; that the facts that C. C. Slaughter and his father had been elected directors of the plaintiff, and respectively president and vice president, "had some right"; that, had it not been for these circumstances, he would not have delivered the bonds to C. C. Slaughter without a written order of some kind; that he considered it sufficient authority from the plaintiff that C. C. Slaughter, its vice president, who had negotiated the deal with Thatcher, asked him to do so; and that if no deal had been made with Mr. Thatcher for the stock, and C. C. Slaughter and his father had not been made officers of the plaintiff, he would not have delivered the bonds to C. C. Slaughter on his receipt as cashier of the defendant.

Under date of February 13, 1915, on the official letter head of the defendant, and over the signature of "C. C. Slaughter, Cashier," the latter wrote Mr. Werkheiser, cashier of the plaintiff:

"I am very much pleased to acknowledge receipt of your favor of February 11th furnishing me a list of the commercial paper now held by your bank which is in the hands of the First National Bank of Pueblo, together with receipt, etc., for which accept my thanks. I desire to state I delivered the receipts to Mr. A. S. Booth this morning, and received in return $55,000 of commercial paper described as follows: [Here followed a list of 11 pieces of this paper, of $5,000 each], and am inclosing copies of the notes which we hold for your account, which you can put in your note case and we will do the necessary towards collecting. I desire to state that the Howe Bros.' note of $5,000 [one of the notes taken over from the First National of Pueblo by Slaughter as cashier of the defendant] was paid, and I received a $5,000 cashier's check, and am crediting your account to-day with proceeds. I also received the bonds you have listed, and am inclosing herewith our receipt for the same, which I believe you will find satisfactory. * * * I would also ask, upon receipt of this letter, you forward the other seven certificates of deposit you hold of the First National Bank of Pueblo, and in lieu of them we will issue our deposits for like amount. * * * We will endeavor to either purchase some commercial paper or give you a good note, and will advise you accordingly sometime next week."

Under the same date and over the same signature, "C. C. Slaughter, Cashier," the latter sent to Mr. Werkheiser, as cashier of the plaintiff, a receipt for the bonds in these words:

"Dear Mr. Werkheiser: The following is a list of the bonds we are now holding for safe-keeping for your account, which were turned over to us by the First National Bank this morning: [Here followed a list of the bonds, aggregating $97,500.]"

Under date of March 8, 1915, over the signature of "C. C. Slaughter, Cashier," the latter wrote Mr. Werkheiser, cashier of the plaintiff, among other things:

"Would also advise we received from the Silver City National Bank of Silver City, N. M., $500 on account of bond No. 12 of the town of Silver City [one of the bonds originally held by the First National of Pueblo for the plaintiff], and are crediting your account $512.50, the $12.50 being interest."

Between February 13, 1915, and the failure of the defendant bank on March 29, 1915, on account of the misappropriations and delinquencies of C. C. Slaughter, who fled and has never returned, the defendant collected from the commercial paper of the plaintiff which it received on February 13, 1915, from the First National Bank of Pueblo $35,000,

and the plaintiff subsequently received back from the receiver of the defendant $25,000 of that paper in kind.

On January 9, 1912, the board of directors of the defendant passed this motion:

"Moved by C. C. Slaughter and seconded by W. D. Grisard that the practice of the bank receiving things of value from its customers for safe-keeping be discontinued, and that all such parties, requesting the bank to keep such things of value, be asked to rent a safety deposit box."

C. C. Slaughter made no record in the books of the defendant of the bonds, amounting to $97,500, of the plaintiff, which he obtained as cashier of the defendant from the First National Bank of Pueblo and none of the other officials of the defendant knew that he had obtained them until after he had pledged all but $10,500 of them on February 20, 1915, to the First National Bank of Kansas City, Mo., to secure the payment of a promissory note of W. B. Slaughter and C. C. Slaughter to that bank for $50,000, with the proceeds of which he bought the controlling interest in the stock of the Alamosa Bank after Slaughter's deal for the purchase of the stock of the plaintiff. There was testimony tending to prove that the signature of W. B. Slaughter to this note and to the letters used to procure this loan from the Kansas City bank was forged. The first of these letters was dated February 15, 1915. Mr. Trotter, an officer of the First National Bank of Pueblo, testified that he had a preliminary talk with C. C. Slaughter about the possible purchase of the interests in the Alamosa Bank, after the deal for the purchase of the stock of the plaintiff, and that the Alamosa deal was a quick one. Search was made for the $10,000 of bonds that were not pledged to the Kansas City bank, but they were never found. Due demand was made by the plaintiff of the defendant and its receiver for the return of all the bonds or the payment of their value before this action was commenced.

The evidence of some of the facts which have been recited was rejected at the trial by the court below, but none of it has been stated or considered which was not, in the opinion of this court, competent and relevant to the issues tried. There was evidence of some other minor facts, but none which are material to the issue whether or not there was error in the direction by the court of the verdict for the defendant.

One cannot thoughtfully consider the established facts that C. C. Slaughter was and had been for two years before this transaction the cashier and the active and uncontrolled manager of all the business of the defendant; that as such cashier he requested and obtained from the cashier of the plaintiff its receipts from the First National Bank of Pueblo for the plaintiff's $60,000 of commercial paper and for some $90,000 of bonds; that at, in effect, one and the same time, and as part of the same transaction, by acting, directing, and receipting as such cashier, he procured from the First National Bank of Pueblo the transfer to the defendant bank of this property of the plaintiff, to wit, more than $30,000 of money on deposit to its credit in its checking account, $60,000 on deposit, for which the plaintiff held the certificates of deposit of the First National of Pueblo, and $60,000 of commercial paper, for which it held the receipts of the latter bank; that at the

same time and as a part of the same transaction, by receipting for them as cashier of the defendant, he obtained and carried away the $60,000 of commercial paper from the First National of Pueblo and $97,000 of the plaintiff's bonds; that the defendant bank received and used the moneys on deposit, collected $30,000 of the commercial paper, and derived the benefit of the use of all these funds—one cannot contemplate these facts without finding great difficulty in resisting the conclusion that there was substantial evidence in this case that by these acts of its cashier the defendant was estopped from denying that these bonds were deposited with and accepted by it for safe-keeping and collection, as were the plaintiff's other securities.

Counsel for the defendant, however, have forcibly and persuasively argued in opposition to this conclusion. One of their contentions is that, at the time the bonds were delivered to C. C. Slaughter as cashier of the defendant, he was also the vice president of the plaintiff, and he and his father owned its stock, and that it was by virtue of his authority as such vice president, and as the representative of himself and his father, that he caused the bonds to be taken from the First National of Pueblo, delivered to himself as cashier of the defendant, and misappropriated. In support of this argument they cite the testimony of Mr. Booth that, after the contract for the sale of the plaintiff's stock, Mr. Thatcher told him thereof and instructed him to turn over the account and securities of the plaintiff in the First National of Pueblo to the Slaughters, and that if no deal for the sale of the stock had been made, and if C. C. Slaughter had not been made vice president and W. B. Slaughter president of the plaintiff, he would not have delivered the bonds to C. C. Slaughter as cashier of the defendant on his receipt as such, and that when C. C. Slaughter, the vice president of the plaintiff, who had negotiated the purchase of the plaintiff's stock requested him to deliver the bonds, he considered that request sufficient authority to warrant him in so doing. But there is no evidence in the record that C. C. Slaughter ever claimed to exercise or did exercise any authority or power as vice president of the plaintiff in getting these bonds into his possession as cashier of the defendant. Booth testified that Thatcher told him before he ceased to be president to turn over all the securities and the account to the Slaughters when they called for them; that when C. C. Slaughter came for them he said, "We have taken one of your accounts away from you—the Mercantile has taken it away"; and that the Mercantile would now take the place and hold the bonds for the First National Bank of Silverton, just the same as the First National Bank of Pueblo had held them for the First National Bank of Silverton.

Moreover, the question here is not by what authority did Slaughter, as cashier of the defendant, get the bonds. No one questions his right to their possession as its cashier. He never asked or pretended to receive them in any other capacity, and the question here is: In what capacity did he take or hold them? Was it as agent and representative of himself and W. B. Slaughter individually, was it as vice president of the plaintiff, or was it as cashier of the defendant? The letters and receipts show on their faces, and the testimony of the witnesses is, that

it was as cashier of the defendant, and no writing or testimony has been discovered to the effect that at the time of the transaction C. C. Slaughter, or any one connected with the transaction, claimed or conceived the idea that he asked for, took, received, or receipted for either the bonds, the commercial paper, the certificates of deposit, or the moneys in the checking account in any other capacity. The fact that he took from the First National Bank of Pueblo the moneys in the plaintiff's checking account, the certificates of deposit issued by the First National Bank, and the commercial paper as cashier for the defendant bank is competent and persuasive evidence to the same effect. This case is as one would have been if, after receiving as cashier of the defendant and carrying away the pieces of commercial paper, he had subsequently appropriated one of them to his own use while the others were accounted for by the bank. The truth is that the agreement of sale of the stock was single, the request for the transfer of all the property of the plaintiff in the possession of the First National of Pueblo and the grant of that request constituted one transaction, and evidence of the treatment of every part of that property is competent and persuasive upon the issue of the capacity in which C. C. Slaughter received and accepted every other part of it.

Another contention of counsel for the defendant is that, even if C. C. Slaughter received and accepted the bonds for the defendant as its cashier, yet since he was during this time the vice president of the plaintiff, and as such had authority to take for the plaintiff the bonds, the other securities, and the moneys from the defendant bank and its cashier, it was as vice president of the plaintiff, and not as cashier of the defendant, or as an individual, that after he had taken them from the First National Bank he appropriated them to the use of himself and his father. But no evidence has been discovered in this record that Slaughter ever exercised his authority as vice president of the plaintiff to do or ever committed any such act, nor can we find any evidence that he or any of the parties in interest ever claimed or thought of his so doing before this suit was commenced.

Counsel contend that since the other officers of the defendant did not know that Slaughter, as its cashier, had received, accepted, and receipted for the bonds as a part of the property of the plaintiff held by the First National of Pueblo and turned over to it, and as no entry of the bonds was made on the books of the defendant, and it never received any of the proceeds thereof, except $500, the knowledge of its cashier that they were obtained and receipted for by Slaughter for the bank was not imputable to it, and consequently it was not estopped from denying the receipt or acceptance of the bonds for safe-keeping or collection by Slaughter's acts. In support of this position they cite and the court has examined American Surety Co. v. Pauly, 170 U. S. 133, 156, 18 Sup. Ct. 552, 42 L. Ed. 977; American National Bank of Nashville v. Miller, 229 U. S. 517, 33 Sup. Ct. 883, 57 L. Ed. 1310; Bank of Overton v. Thompson (8th C. C. A.) 118 Fed. 798, 800, 56 C. C. A. 554; Central Coal & Coke Co. v. Geo. S. Good Co. (8th C. C. A.) 120 Fed. 793, 798, 57 C. C. A. 161; Mulrooney v. Royal Ins. Co. (8th C. C. A.) 163 Fed. 833, 835, 90 C. C. A. 317;

Interstate Nat. Bank v. Yates Center Nat. Bank (8th C. C. A.) 245 Fed. 294, 157 C. C. A. 486; School District v. De Weese (C. C.) 100 Fed. 705; Gunster v. Scranton Illuminating Heat & Power Co., 181 Pa. 327, 37 Atl. 550, 59 Am. St. Rep. 650. In American Surety Co. v. Pauly, the president of a bank certified to the honesty and integrity of a Mr. O'Brien, and a surety company in reliance upon that certificate signed his bond, and the court held that the bank was not liable to the surety company, because the making of such a certificate was not within the scope of the power or duties of the president of a bank. But surely the acceptance and receipt by the cashier of a bank of the moneys on deposit, commercial paper and bonds of another bank for safekeeping and collection, are not beyond the general scope of the powers of such a cashier.

In School District v. De Weese (C. C.) 100 Fed. 705, 708, 709, the cashier of a Sedalia bank, as agent of a school district, sold some new bonds it had issued to pay off old bonds, paid the proceeds of the sale for and took up the old bonds, but did not cancel them, and sold the old bonds again, and placed the proceeds to the credit of his bank with its Eastern correspondent, and as soon as this was done placed these proceeds to his own individual credit in his account with his bank. The court held that because, from the time this cashier wrongfully sold the old bonds, which he ought to have canceled, he evidently had the intention to steal or appropriate them and their proceeds, that he was from that time acting in his own interest adversely to that of his bank, and that consequently his knowledge that the old bonds and the proceeds thereof were the property of the school district was not imputable to that bank. This and the other authorities cited rest on the exception to the general rule that the knowledge of and notice to the agent is the knowledge of and notice to his principal which arises when the agent is shown to have been acting in a transaction adversely to his principal for himself and in his own interest.

The evidence in this case does not bring it under this exception because no substantial evidence has been found that before or at the time the bonds, the other securities, and the deposits were received and accepted by C. C. Slaughter as cashier of the defendant, and that transaction was finally closed on February 13, 1915, Slaughter was ever acting in his own interest adversely to the bank, and there is very persuasive, if not conclusive, evidence that he was not so acting in the transaction. If he had been, he could easily have appropriated to himself the $30,000 in the checking account or the $60,000 represented by the certificates of deposit, without the delay, labor, and inconvenience of procuring the loan of the Kansas City bank. The legal presumption is that in this transaction he was acting honestly and faithfully until it was completely closed, and that he did not conceive the intention to misappropriate any of this property until some days after the property was delivered to him on February 13, 1915. The testimony accords with the presumption and his knowledge of that transaction must be imputed to the defendant, and it is thereby estopped from denying that it received and accepted the bonds from the plaintiff for its account (Lerch v. Bard, 162 Pa. 307, 29 Atl. 890, 893, 894), at the time of this transaction.

And since the plaintiff had the right to rely on the general rules that the cashier of a bank has greater inherent power than any other officer thereof and is ordinarily its active manager and agent, that, while those who deal with him as cashier are presumed to know the extent of his general powers, a limitation thereof is not binding on those who are not cognizant thereof (7 C. J. § 160), that he is held out to the public as having authority to act according to the general usage, practice, and course of business conducted by such institutions, and generally evidence of such usages, practice, and course of business is competent and admissible, that his acts within the scope of such usage, practice, and course of business will generally bind the plaintiff in favor of third persons, and that those dealing with a bank have a right to presume integrity on the part of its cashier when acting within the apparent sphere of his duties, and the bank is bound accordingly, the legal presumption is that a cashier, performing his functions within the scope of the powers of the bank, acted in his official capacity rather than in an individual one, and for the interest of the bank rather than adversely to it and for his own and other interests. When all the evidence in this case is considered in the light of these familiar rules, the conclusion is unavoidable that it was such that, if it had been submitted to the jury under proper instructions and they had returned a verdict for the plaintiff, it would not have been the duty of the court below to set it aside, and it was such that reasonable men in the exercise of an honest and impartial judgment of the evidence might well conclude that the plaintiff was entitled to a recovery.

Referring, now, as briefly as convenient, to some other questions than the sufficiency of the evidence to sustain a verdict for the plaintiff, these conclusions have been reached:

[3] The absence of knowledge of the other officials of the bank of the receipt and acceptance of the bonds, the failure of C. C. Slaughter to record the bonds in the books of the bank, and the failure of the defendant to derive benefit from the bonds because its cashier, after his receipt and acceptance of them for the defendant, unlawfully appropriated them to his own use, did not revoke his authority to receive them for it or relieve it from its liability to account for them to the plaintiff.

The fact that the receipt of "C. C. Slaughter, Cashier," dated February 13, 1915, read, "The following is a list of the bonds we are now holding for safe-keeping for your account," did not render other written evidence or parol evidence inadmissible to show, or estop court or jury from finding upon convincing and competent evidence, that the taking by the defendant at the same time of all the moneys and securities formerly held by the First National Bank of Pueblo, including the bonds, was for safe-keeping and collection, and that the bailment was not gratuitous.

The motion adopted by the board of directors of the defendant, to the effect that the bank should discontinue holding articles of value for customers and should request them to take safety deposit boxes, did not restrict or limit the authority of Slaughter as cashier to receive

273 F.—9

and accept for the defendant the moneys and securities taken from the First National of Pueblo.

Evidence of the negligence of the defendant, if any, prior to February 13, 1915, in failing to employ one as cashier fit in ability, character, integrity, and habits, or in retaining one unfit to discharge the responsible duties of that office, in failing to examine with proper care and frequency his accounts and acts with and for the bank, to discover in him a character, acts, or habits that disqualified him for such an office, was competent in rebuttal on the trial of this action below, and doubtless will be competent at the trial to come. Preston v. Prather, 137 U. S. 610, 611, 11 Sup. Ct. 162, 34 L. Ed. 788.

In case the defendant claims in the next trial that C. C. Slaughter took the bonds, or any of them, from the defendant after February 13, 1915, in the capacity of vice president of the plaintiff, the receipt of the Bankers' Trust Company of February 15, 1915, will be material and competent evidence as to that claim. The silence of the court upon questions presented upon which no decision is announced does not indicate any opinion of the court upon them.

Let the judgment below be reversed, and let the case be remanded to the court below, with instructions to grant a new trial.