## GLOVER *v.* AMES.

*(Circuit Court, D. Maine.* 1881.)

1. **PUBLIC SALE OF CONDEMNED VESSEL—PURCHASE BY MASTER—RATIFICATION BY OWNERS.**

    A. owned nine-sixteenths of a brig, B. and C. each one-eighth, and other parties the balance. While on a voyage with A., as master, the brig was damaged by a storm, and on report of the surveyors was condemned, and by order of the master sold for whom it might concern at public auction. A., through a third party acting in his behalf, became at the sale the purchaser of the brig. B., as the agent of A., afterwards sold the brig to C., who sold her to the defendant, against whom A. brought an action of replevin for the brig. *Held:*

    (1) That such purchase by the master, though made through another, was invalid, and did not divest the other owners of their interest, unless subsequently ratified by them.

    (2) That B. and C. had ratified and confirmed the sale, the one by selling and the other by purchasing the brig as the property of the plaintiff, with knowledge of the indirect purchase by A. at the sale, and the consequent invalidity of his title.

    (3) That as the defendant claimed title through B. and C., and claimed no rights under the other owners, it was immaterial in this action whether the latter had ratified the sale or not.

2. **SALE BY AGENT—ADVERSE INTEREST—REVOCATION OF AUTHORITY—LIEN—WAIVER.**

    A. was indebted to the firm of B. & Co., composed of B., C., and X., for advances on the brig's account, and B. was individually responsible to the firm for the debt. B. held a power of attorney from A. "to transact any and all business in relation to my property and interest, to sell, transfer, and deliver such of my property to such persons and for such sums and on such terms as to him, my said attorney, may appear proper and expedient, and to make and execute all necessary bills of sale and acquittances therefor." This was given by A. when he expected to be absent from the country, and the agency was created solely for his own advantage, and was not intended to be coupled with any interest or as security to the attorney. Acting under this power of attorney, B. sold the brig at private sale to C. for her full cash value, and the amount was credited to A. on the books of the firm. C. afterwards sold the brig at public auction, to the defendant, who was present at the sale and heard A. forbid the sale and claim the brig as his property. In replevin by A. against the defendant for the brig, *held,*—

    (1) That B., as agent, in thus disposing of the vessel to C. to pay a firm debt for which he was individually accountable, was acting in a matter in which his own personal interests were in conflict with the interests of the plaintiff, and the sale was therefore invalid.

    (2) That, if the adverse interest of the agent did not invalidate the sale, it was invalid for the reason that the power of attorney had been revoked, as to the brig, before the sale, by a letter of the plaintiff to B. and C., directing them as to the place and manner of keeping the brig until his return from abroad.

    (3) That C., being cognizant of the power of attorney and the letter of revocation, could acquire no title by the sale, and the defendant, having received notice of the plaintiff's claim, could have no better rights than C. to the brig.

(4) That the defendant acquired no lien upon the vessel, either for those repairs made by order of C. or for those made by himself as her owner, or for the dockage of the vessel.

(5) That the purchase of the vessel by the defendant from C., by bill of sale, with covenants of warranty of title, and afterwards taking possession of her, claiming absolute ownership, and dealing with her in all respects as his own, was a waiver of any lien for repairs done by C.'s order, if any such lien ever existed.

*Washington Gilbert* and *Wm. L. Putnam*, for plaintiff.

*A. P. Gould* and *S. C. Strout*, for defendant.

Fox, D. J. On the seventh day of June, 1880, the plaintiff sued out this writ of replevin for the hull, spars, sails, and rigging of the brig J. M. Wiswell, then in the ship-yard of the defendant at Rockland, in this district, where she was undergoing repairs by the defendant, who claimed title thereto by purchase at a sale by auction of the brig, by William H. Glover, on the first day of May, 1880. This vessel, under the command of the plaintiff, sailed from Havre in May, 1878, bound for Montevideo; the next day she met with bad weather, sprung a leak, and was taken into Dartmouth, England, where she was voluntarily run ashore to save the cargo. She was, by so doing, badly strained, and after discharging her cargo, and three surveys upon her, she was, on the report of the surveyors, condemned and sold, August 23d, for whom it might concern, at public auction, and was struck off to the plaintiff for £425. At the time of the disaster the plaintiff owned nine-sixteenths of the brig, and E. K. and W. H. Glover, his brothers, each one-eighth, the balance being owned in Boston. The vessel was sent by the plaintiff to Rockland in charge of the mate. She arrived there in October, the plaintiff remaining in England to effect a settlement of the general average with the owners of the cargo.

The first question which arises is as to the effect of this sale, made by order of the master at Dartmouth, upon the interests of the other owners, the master having at the sale become the purchaser. It is not questioned by the learned counsel that a sale made under such circumstances does not divest the interests of the other owners unless ratified by them, which it is claimed was done by them in the present instance. The plaintiff, after the sale, did not inform the other owners how the sale was effected, but he did communicate to them the fact that he had become the owner of the vessel and of his claim as her sole owner; and it is not disputed that E. K. and W. H. Glover afterwards, by their conduct and declarations, by E. K.

selling the vessel as the property of the plaintiff and William H. purchasing the same at such sale, ratified and confirmed the sale, if they are to be deemed cognizant of the fact that the plaintiff was himself the purchaser. The statements of each of these parties is that, while he understood that the plaintiff had purchased the vessel and sent her to Rockland as his individual property, he did not know that the plaintiff purchased her himself at the auction, but understood she was purchased by some third party, from whom the plaintiff afterwards obtained his title, and that such purchaser, having by his purchase in his own behalf obtained a valid title at the auction sale, could afterwards convey such title to the plaintiff.

It appears from the testimony of both E. K. and W. H. Glover that Parker, the mate, on his return in the vessel, informed him of the sale. E. K. says Parker told him "Charles had bought her; she was sold at auction, and a friend had bought her for him, and Charles had got her from him." W. H. Glover's statement is similar to E. K.'s, with the addition "that he thinks Parker said that the purchaser bought her in for Charles." From their testimony the court entertains no doubt that both these witnesses understood that the purchaser at the auction sale was acting in behalf of Charles, and for his benefit, and that Charles thus, through the intervention of a friend, became at the sale the purchaser of the brig. Such a course is as clearly inoperative to divest the title of the original owners as a direct and open purchase by the master. He cannot indirectly thus accomplish that which the law forbids his doing directly, and E. K. and William H. Glover, therefore, are chargeable with knowledge of the invalidity of plaintiff's title, and they must be held to have voluntarily assented to and confirmed it, knowing it was thus invalid. It is quite probable that at the time they thus ratified the sale they believed the plaintiff had purchased the vessel through a third party as his agent, and did not suppose that he himself was the purchaser; but whether the purchase was by the plaintiff himself, or through a third party, is of no consequence. In either case it was of no validity against the prior owners unless it was afterwards sanctioned by them.

E. K. and W. H. Glover, after they were informed that the plaintiff had illegally purchased the vessel, might ratify the sale, if they chose so to do, and their subsequent dealings with her as solely the property of the plaintiff must debar them from ever after asserting any interest in her.

v.8,no.5—23

It is claimed that there is no evidence of a ratification by the Boston owners of this sale, and of the purchase by the master. It is unnecessary to determine whether, by their subsequent conduct, these owners should not be held to have sanctioned her sale, as in this action it is wholly immaterial whether they do or not still retain their interest in the brig. The defendant has in no way acquired any rights under the Boston owners. At the time he took possession of the vessel he was not acting in their behalf, and, unless he can establish his own title, he is a mere stranger to her, with no right or authority whatever to withhold her from the plaintiff, the owner of thirteen-sixteenths, if not the entire ship. After the arrival of the brig at Rockland her crew were pressing for their wages, which, with the custom-house charges, amounting in all to about $1,300, were paid by the firm of W. H. Glover & Co., composed of E. K. and W. H. Glover and Albert Lowry; E. K. Glover, who held a power of attorney, hereafter referred to, from Charles, having become personally accountable to the firm for the payment of these advances, which were charged on the firm books to the brig's account. For some years the firm had kept an account with the brig, which, after the plaintiff's purchase at Dartmouth, was continued on the books as before without any change.

The firm also had a private account with the plaintiff, for the payment of which E. K. had rendered himself accountable. These accounts are still unsettled. Probably, on a final adjustment, there will not remain a large amount due from the brig to the firm, but the plaintiff, on his private account, will be found indebted to them for a considerable amount. Plaintiff remained abroad until May, 1879, but he rendered to the firm no account with the ship after leaving Galveston, the port from which he sailed for Havre, but he did remit from Havre to the firm £240 on the ship's account. In October the ballast was discharged from the vessel, and she was laid up that fall and winter at the breastwork of the defendant. The plaintiff, from time to time, wrote the firm and E. K. Glover, advising them that he was endeavoring to collect the general average, and that he had commenced proceedings in chancery for that purpose; but there was nothing in his communications from which his brothers derived any great hope of a successful result, and they advised him to make the best settlement possible and return home. In April, William H., in behalf of his firm, undertook to take measures to secure to the firm the amount of plaintiff's indebtment, and applied to Mr. Hall, an

attorney at Rockland, for that purpose. Hall informed him that an attachment of the brig would be attended with considerable expense, and that E. K. held a power of attorney from the plaintiff which had been drawn by Hall some years previously, and which authorized E. K. Glover to dispose of the vessel.

This instrument was executed October 22, 1867, by Charles, who thereby constitutes E. K. Glover his attorney "to transact any and all business in relation to my property and interest, to sell, transfer, and deliver such of my property to such persons and for such sums and on such terms as to him, my said attorney, may appear proper and expedient, and to make and execute all necessary bills of sale and acquittances therefor, to collect any and all debts or sums of money due me, and to receipt therefor as fully and with the same effect as I might myself do." This instrument was sealed, acknowledged, and recorded. Charles testifies that at the time this paper was executed by him he was bound to sea; and, as he would be absent much of the time, this paper was given E. K. Glover, so that he could at any time dispose of any property for him, if he should instruct E. K. Glover so to do, but that he was not to act under the power unless specially directed. This is denied by E. K. Glover, who asserts that there was no restriction or limitation whatever of his authority under this instrument. E. K. Glover, as attorney for Charles, in 1871, by virtue of this power of attorney, conveyed two lots of land in Rockland, but Charles says that the limit at which they should be sold was fixed by him. E. K. Glover, in behalf of the plaintiff, also effected insurance upon the brig at various times, executing notes for the premium in the name of the plaintiff, and through the firm he provided support for Charles' wife in his absence; and in November, 1879, by a written notice to E. K. Glover, the plaintiff revoked all the authority conferred upon him by this instrument.

Being advised by Hall that he could legally sell the brig under this power of attorney, E. K. Glover inquired of various parties interested in shipping as to the value of the brig, and April 14, 1879, he sold her to his brother, W. H. Glover, for $2,175, which was paid by his note, and the amount was credited to the plaintiff upon the books of the firm. This amount was the full cash value of the brig in her then condition, and the plaintiff could not in any way have realized for her any larger amount. The reasons assigned for selling the vessel at that time are—*First*, that William, in behalf of the firm, threatened to attach the vessel unless she was sold and the amount

received paid to the firm; *second,* that the plaintiff was involving himself in litigation in chancery, and that this brig was all of his property and would be likely to be taken from him if he should be unsuccessful; *third,* that the vessel was depreciating in value, and there was no certainty as to his return, and that it was for his interest to thus dispose of her.

In the opinion of the court the real cause of the sale is the one first assigned, to-wit, that William, for some cause, then insisted on payment of the amount for which the plaintiff was then indebted to the firm; and the question is whether by this instrument E. K. Glover, as the agent of the plaintiff, was authorized in his behalf thus to sell at private sale to his brother this vessel, to raise means with which to discharge the plaintiff's indebtment to the firm of which E. K. Glover was a member, he being also personally accountable to the firm for the payment of these claims. The language of the instrument is broad and comprehensive, authorizing E. K. Glover to sell, transfer, and deliver such of the plaintiff's property—

"To such persons and for such sums and on such terms as to him, my said attorney, may appear proper and expedient, and to make and execute all necessary bills of sale therefor."

This authority might, perhaps, under ordinary circumstances, be sufficient to sustain a sale of a vessel to a stranger, when the purpose was not thereby to obtain the means of payment of a demand due to the attorney, but will it support the present proceedings? At the time this instrument was given, the plaintiff expected to be absent from the country, and it does not appear that he was then indebted to the firm or either of its members, and it is not claimed that this instrument was intended to be coupled with any interest or as a security to the attorney. The agency was created solely for the benefit and advantage of the plaintiff, and in his behalf, and everything which was to be transacted under it was to be done in the interests of the plaintiff, and in no respect in promotion of any profit or personal benefit of the attorney. While acting under this authority he could not assume any duty incompatible with the interest of his principal, nor act in any transaction where he himself had any adverse interest.

The remarks of Lord Cranworth in the House of Lords, 1 McQueen, 461, (*Railway Co.* v. *Blakie,*) are pertinent to this proceeding. An agent has duties to discharge of a fiduciary character towards his principal, and it is a rule of universal application that no one having

such duties to discharge shall be allowed to enter into engagements in which he has or can have a personal interest conflicting, or which possibly may conflict, with the interest of those whom he is bound to protect. So strictly is this principle adhered to that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal, with the estate or interest of those for whom he is a trustee, have been as good as could have been obtained from any other person; they may even at the time have been better; still, so inflexible is the rule, that no inquiry upon that subject is permitted, or, as is stated by Judge Story in his Commentary on Agencies, section 210,—

" In matters touching the agency, agents cannot act so as to bind their principals, where they have an adverse interest in themselves. This rule is founded upon the plain and obvious consideration that the principal bargains in the employment for the exercise of the disinterested skill, diligence, and zeal of the agent for his own exclusive benefit."

To use the language of Mr. Justice Wayne in *Michaud* v. *Girod,* 4 Howard:

" The agent must refrain from placing himself in relations which ordinarily excite a conflict between self-interest and integrity. The disability is a consequence of that relation between the parties, which imposes on one the duties to protect the interest of the other, from the faithful discharge of such duty his own personal interest may withdraw him. In this conflict of interest the law wisely interferes. It acts not on the possibility that in some cases the sense of that duty may prevail over the motive of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty."

In that case an executor had purchased the property of the testator through a third person, but this language of the court is alike applicable to the sale under consideration.

In *Stainbrock* v. *Read,* 11 Grattan, 291, this principle was applied to a case in some respects similar to the present. There a power of attorney was given to an agent to draw bills, indorse notes, etc., but it was held that the agent was not authorized thereby to draw bills for his own benefit, but only for the benefit of his principal.

So in *Parsons* v. *Webb,* 8 Greenl. 38. An agent was there authorized to sell the plaintiff's horse. He sold him to his own creditor in payment of his own debt, and it was held that the sale was invalid, and that the original owner could maintain replevin for the horse against a subsequent vendee. In thus disposing of this vessel to his

brother William, to pay a debt due to the firm of which both were members, E. K. Glover was acting in a matter in which his own personal interests were in conflict with the interests of the plaintiff. He was, as agent of the plaintiff, bound to protect him, but in thus disposing of the vessel he was promoting his own interests by attempting to thus collect a debt due to his firm, and for which he was also individually accountable.

If enough could be realized from the sale to pay the claims of the firm against the plaintiff, it was for his interest to dispose of the property, although of much greater value, and a conflict of interest might arise which the law would not sanction. The suggestion that this vessel constituted all of the plaintiff's property, for two reasons is of no avail: *First,* it is not correct, as there was a large amount of insurance upon her for the plaintiff's benefit; and, *second,* if it had been all of his property, this power of attorney did not authorize the agent to thus dispose of it on that account, or because she was depreciating in value. If the view thus taken by the court as to the authority thus conferred by this instrument is not correct, the sale of the brig was invalid for the further reason that any authority to dispose of this vessel which might once have existed under this power was revoked before the sale. On the twenty-ninth of September, 1878, the plaintiff wrote the firm from Dartmouth:

"I think I must say something in regard to the brig, if she gets home all right, which in all probability she will, before I do. I don't know as you can do anything, before I get home, more than to take out the ballast and get her into a safe place; and I don't know any other safe place than the cove opposite your wharf. You can then take off all sails and running rigging, and moor with chains, and let the cook keep ship as I arranged with him."

The power of attorney, therefore, must be taken in connection with this letter, the same as if incorporated therein; and there can be no doubt that if the same were found in the instrument itself, it must have restricted and limited the authority of the agent, and he would have had no right afterwards to dispose of the brig, especially for the purpose of paying the claims against his brother, for which he was himself accountable. She was sent home for a special purpose; had been bought shortly before by the plaintiff for about $2,000; and it is quite manifest from all of the correspondence that both members of the firm well understood that the object and intent of the plaintiff in so purchasing her was to repair her.

No man, after reading this correspondence, could have supposed that the agent still had authority to sell the vessel without further

orders. On the contrary, she was to be kept until the plaintiff returned—was not to be sold from under him—and the place and manner of keeping her were distinctly stated both to the agent and the purchaser. Receiving the vessel under these instructions the agent was bound in law to conform to them. Whatever previous authority he had as to the sale of the vessel was modified and limited by these instructions, and if the agent thought it to be for the best interest of his principal to dispose of her, he could only do so upon advising him of his opinion and obtaining his assent to her sale. The general authority bestowed by the power of attorney to dispose of property of the plaintiff was not wholly cancelled and revoked, but all control over this brig was restricted by this letter to the purposes and object therein stated, and it was as clear a revocation of any authority to dispose of her as if contained in a formal power of attorney. William H. Glover was cognizant of the extent of the power of attorney, and also of this letter of the plaintiff of the twenty-ninth September, directed to his "dear brothers," and he could not have acquired a valid title to the vessel by any sale made after the reception of this letter by E. K. Glover, as attorney for the plaintiff.

On the return of the plaintiff to Rockland, in May, 1879, he immediately repudiated the sale and insisted on his title, but William remained in possession of the brig until she was sold by him at public auction in May, 1880, to the defendant, who was present at the sale, and heard the plaintiff forbid the sale and claim that she was his property. The defendant, therefore, can have no better right than William to the brig, and William's title having been proved invalid, the defendant by his purchase acquired no title to her. The defendant further insists that, under the direction of William, he made same repairs on the vessel, and that after his purchase up to the time of the replevin he was repairing her on his own account, and that for these repairs, as well as for dockage of the brig, he held a lien upon her which will defeat this suit. In making these repairs by order of William the defendant was a trespasser. William had no interest in the vessel, and could not authorize the defendant to make these repairs so as to affect the interest of the plaintiff. By such repairs the defendant acquired no lien upon the vessel, either for those done by William's order or for those made by himself as her owner, the latter being made by him not for any other party, but under a claim of sole ownership as upon his own property, and no lien could arise therefrom. The claim to a lien for dockage is also liable to the same objection. William had no authority from the

plaintiff to place her in the defendant's dock.   Instructions from the plaintiff were "to moor her in the river;" but after the alleged sale to William she was placed in the dock, by his orders, to be repaired as his property and at his expense.

Under the authority of *Small*. v. *Robinson*, 69 Me. 427, the defendant, as against the plaintiff, never acquired any lien on the vessel for dockage or repairs.   If such lien ever existed, he waived it by purchasing the vessel from William by bill of sale, with covenants of warranty of title, and afterwards taking possession of her, stripping and repairing her, claiming an absolute ownership thereto, and in all respects dealing with her as his own property.   That such a claim is a waiver of any previous lien was ruled in 2 Blackf. 465, and this decision is sustained by *Jacobs* v. *Latour*, 5 Bing. 130.

Judgment for plaintiff.