8 F.2d 166 (1925)
THE PACIFIC MARU.
THE LEON.
KAWASAKI KISEN KABUSHIKI KAISHA
v.
ATLANTIC TOWING CO. et al.
District Court, S. D. Georgia, E. D.
September 25, 1925.
Anderson, Cann & Cann, of Savannah, Ga., and Hunt, Hill & Betts, of New York City, for libelant.
Lawton & Cunningham, of Savannah, Ga., for respondents.
BARRETT, District Judge.
The Pacific Maru, a Japanese steel cargo steamer, 385 feet long, 51 feet broad, 36 feet molded depth, of 9,010 tons deadweight capacity, loaded with 8,324 tons of nitrate of soda in bags, which it had loaded in Chilean ports, of which 2,000 tons were to be discharged at Savannah, arrived off Tybee Bar at the mouth of the Savannah river at about 2 o'clock a. m. August 11, 1923, and anchored to await the river pilot. The pilot boarded the steamer at 5:50 a. m., and the vessel came up the river to the city of Savannah under his charge.
The tug Leon is owned by the Atlantic Towing Company. Her captain, Nicolich, boarded the Pacific Maru at 9:45 a. m. There is dispute as to the time when he took command for the purpose of docking the steamer. The testimony as to the location of the steamer when Capt. Nicolich took command is in direct conflict. According to the testimony of libelant, the steamer was opposite the Atlantic Coast Line wharf, which is about three-quarters of a mile down the river from the wharf of the Seaboard Air Line Railway, where the steamer was to be docked. According to libelee the steamer was approximately opposite Price street, which is only a short distance down the river from the Seaboard Air Line wharf. The Seaboard Air Line wharf is on the north side of the river, and the Atlantic Coast Line wharf on the south side. The steamer grounded opposite the Seaboard Air Line wharf at 10:30 a. m. Its exact position is in some dispute, as to whether it was opposite slip No. 2 or slip No. 3. The tide was ebbing, and at 10:30 a. m. it was 3 feet above mean low water. At that period of the year the rise of the tide was about 7 1/10 feet.
According to Capt. Nicolich, immediately upon boarding the ship, he inquired of the pilot what was the draft of the ship, and his response was that he did not know, but that the captain of the ship had told him that the draft was 27 feet sea water, equivalent to 27 feet 6 inches fresh water, and that this inquiry was made in the hearing of Capt. Kashiwa of the Pacific Maru. Capt. Kashiwa denies this. Capt. Nicolich claims that, upon learning of this draft, he stated that it would be impracticable to dock at that time the steamer in slip No. 3 of the Seaboard Air Line wharf, where she was ultimately to go, and that the best thing to do would be to put the steamer at berth 32; *167 that is, at end of pier between number two and number three slips of the Seaboard Air Line wharf. There is a conflict as to the time elapsing between Capt. Nicolich's taking command and the stranding; libelant claiming that it was from 9:45 to 10:30, and Capt. Nicolich claiming that it was only the time occupied by the steamer in moving about two vessels' length. When the vessel first grounded it was then backed off, which was accomplished without much difficulty, and was again moved upstream, with the purpose on the part of Capt. Nicolich to get to the pier.
Again the vessel grounded, and despite vigorous efforts to push forward became firmly fixed. All parties then recognized that the vessel could not be floated before the tide commenced to flood, which would not occur until the afternoon. The vessel stood at some angle, the stern being nearer the middle of the stream. According to Capt. Nicolich, he inquired of Capt. Kashiwa whether he had appropriate hawsers or cables to run from the stern to the Seaboard Air Line wharf, to hold the vessel upon the flood tide, and that Capt. Kashiwa said he did not have the hawsers or cables. Capt. Kashiwa denies such conversation, and states that he had several new hawsers and cables appropriate for such use. Capt. Nicolich and others testified that such hawsers or cables were not a part of the equipment of a tug. In the afternoon, about 4 o'clock, the tug Leon and the tug William F. McCauley, which latter tug belonged, also, to the Atlantic Towing Company, came to the ship. The McCauley took its position on the starboard side, with line attached near the stern of the ship, and the Leon took its position on the port side, facing downstream. As the tide flooded, the stern lifted, but the stem remained fixed, with the result that the stern drifted to port and continued to do so, despite the efforts of the McCauley in pulling and the Leon in pushing. When the vessel was at approximately right angles, forming thus a dam almost across the entire channel, the stem was unloosed, and the steamer drifted up the river. In doing so its stern struck a hard bottom, with serious injury; among other things breaking off its stern a portion of metal weighing about 5 tons. The steamer was temporarily tied to the wharf on the south side of the river, and thereafter at flood tide was moved over into slip No. 3 of the Seaboard Air Line wharf.
There is conflict between the testimony of the opposing parties, and some conflict also between the log of the vessel and the other testimony furnished by libelant as to the draft of the ship. Records were introduced showing the draft at Iquique, in Chili, and at Balboa, the Pacific entrance to the Panama Canal, in Gatun Lake, and in slip No. 3 of the Seaboard Air Line wharf the night of its arrival there and the subsequent day. Capt. Kashiwa does not deny telling the pilot when he came aboard the draft of the vessel and claimed that he meant the mean draft. It was his opinion that the vessel was of the same draft throughout, as he claims to have used the water and oil from the forward and aft tanks in such proportions as to maintain the balance. According to the measurement of the first mate of the vessel, the draft taken while she was in the slip at Savannah the night of arrival was 27 feet 11 inches forward and 27 feet 5 inches aft. The log of the vessel showed 28 feet forward and 27 feet 4 inches aft. According to Capt. Nicolich, who took the draft of the ship at 10 p. m. on the date of her arrival, the forward draft was 28 feet 2 inches and the aft 27 feet 6 inches.
Libelant offers the following explanations of why the draft at the bow after the accident was in excess of what Capt. Kashiwa understood it was when he came into the river: (1) That the dropping of five tons of metal from the stern would tend to sink the bow. (2) In No. 1 hold, which was in the forward end of the ship, the cargo of bagged nitrate had been stored in tiers and kept about 2 feet away from the bulkheads, in order to avoid staining the bags; that upon examination of the cargo at Baltimore, where the vessel went after leaving Savannah, it was ascertained that the cargo in the lower hold and the lower between-decks had broken down and fallen forward, filling up the space between the forward bulkhead and the original tiers. This hold was 18 feet deep and 41 to 42 feet wide. It is inferred that the falling of these bags was due to the stranding and that this caused a sinking of the bow. (3) The No. 1 ballast tank, toward the bow of the ship, was caused to fill, in part at least, with water, by reason of certain of the strake plates being injured by the stranding. The addition of 38 tons would cause the vessel to sink one inch. There is no evidence as to the amount of water that was in this ballast tank at the time of the taking of the draft.
The libel is brought in tort against the three barges Leon, William F. McCauley, and Cambria, and against their owner, the Atlantic Towing Company. Thereafter the libel against the Cambria was dismissed. The allegations of negligence are as follows:
"(1) In attempting to bring the Pacific *168 Maru, her mean draft then being 27 feet 7 inches fresh water, up the river from the Atlantic Coast Line docks to the Seaboard Air Line pier No. 3 when water was low, from 9:45 to 10:50 a. m.
"(2) In failing to wait until high water before bringing the Pacific Maru up the river from the Atlantic Coast Line dock to Seaboard Air Line pier No. 3.
"(3) In failing to tie up the Pacific Maru to the Seaboard Air Line pier after she first grounded at 10:50 a. m., about 30 feet off the end of the Seaboard Air Line's pier No. 2.
"(4) In attempting to get the Pacific Maru off the bottom where she had first grounded at 10:50 a. m. by the use of her engines, without waiting for high water, which maneuver caused her to go more firmly aground further out in the channel.
"(5) In attempting to move the Pacific Maru from her position where she was grounded at 4:15 p. m. on August 11, 1923, instead of waiting for high water at 8 p. m.
"(6) In attempting to move the Pacific Maru at 4:15 p. m. with two tugs of insufficient power to hold the vessel against the tide.
"(7) In improperly attaching the tugs Leon and William F. McCauley to the Pacific Maru, so that they did not exert their full power in holding the stern of the vessel against the tide, so that it swung to port and grounded on a well-known and charted shoal.
"(8) In failing to hold the Pacific Maru and prevent her stern swinging to port and going aground on a well-known and charted shoal.
"(9) In grounding the Pacific Maru at 10:50 a. m., 4:56 p. m., and 5:07 p. m., on well-known and charted shoals, thereby causing great damage to her hull and propelling machinery.
"(10) In other respects to be shown at the trial."
In August, 1923, the owner of the vessel maintained an office at No. 1 Broadway, New York City, for the transaction of business. Suzuki & Co., Limited, maintained offices at 220 Broadway. It is insisted by libelant that the owner had charge of the operations of its vessels, including the Pacific Maru, and that the business of Suzuki & Co., Limited, was limited to obtaining cargoes, collecting freights, and disbursing the vessels out of the money so collected, and that they had nothing whatsoever to do with the operations of said vessel in August, 1923. The contract between the owner and Suzuki & Co. was not in writing. On August 6, 1923, Suzuki & Co., Limited, wrote a letter to Capt. Kashiwa, care of Messrs. Trosdal, Plant & Lafonta, at Savannah, and sent a copy of this letter to Trosdal, Plant & Lafonta, the material portions of which are as follows:
"As already provided in charter party, your steamer is to be consigned to charterers' agent at discharging ports, namely, Messrs. H. J. Baker & Bro. We have nevertheless appointed Messrs. Trosdal, Plant & Lafonta for your general protection and to your interests; therefore you may rely upon this firm in carrying out details of this charter party, such as tendering your steamers and arrangements with stevedores," etc.
The charterer had the right to designate where the vessel should be docked. On August 8, 1923, Trosdal, Plant & Lafonta wrote to Capt. E. C. Daniels, harbor master, a letter, of which the following is a copy, and of which letter a copy was sent to Capt. Frank W. Spencer, 220 East Bay street, Savannah:
"Capt. E. C. Daniels, Harbor Master, City Hall  Dear Sir: Japanese S/S Pacific Maru. This steamer sailed from Colon, Panama, on August 2d, and we figure her due at Savannah about the 9th or 10th to discharge cargo. We have been requested by charterer's agents, Messrs. H. J. Baker & Bro., to instruct you to have her docked at Seaboard Air Line Railway Company's terminals, berth No. 36.
 "Yours very truly,
 "Trosdal, Plant & Lafonta,
 "By F. X. Beytagh."
According to the testimony of Capt. Spencer, this was the usual form of letter written by ships' agents to employ the services of the towing company. When Capt. Nicolich boarded the steamer, Capt. Kashiwa did not know where the ship was to dock, and Capt. Kashiwa did not undertake to make any contract, but supposed that arrangements had been made by the agent in advance of his coming. No direct action was taken by the owner of the vessel to procure the services of a towing company, so far as is disclosed. After the vessel had been docked, the towing company rendered its bills for services rendered in moving the ship, and these bills were paid after having been approved by Capt. Kashiwa. He objected, in discussing the same with Trosdal, Plant & Lafonta, through whom the bills had come, as to their being too large, but upon being shown by them the tariff he approved the same. There is no evidence that *169 Suzuki & Co. failed to reimburse Trosdal, Plant & Lafonta, and no evidence that the owner failed to reimburse Suzuki & Co. the amounts thus expended.
The towing company had a printed tariff, which had on the front, in conspicuous letters at the very top of the sheet, "Conditions and Rates for Tug Services." On the first page of the inner sheets, before the schedule of rates, appeared this notice, the word "notice" being in prominent letters:

"Notice.
"In consideration of accepting service for any one or more of the tugs of this company for rates herein fixed, or other sums established by custom or contract, to be paid for services of a tug or tugs owned and/or employed by this company, it is expressly understood and agreed that all towing, moving, shifting, docking, undocking, or other handling of a vessel or craft of any character by such tugs anywhere for said rates, or other sums established by custom or contract, is done at the sole risk of such vessel or craft and its cargo, and that neither the tug or tugs used in the service, nor the owner, nor the charterer, nor the hirer thereof, shall be liable for any loss or damage of any nature whatsoever occurring through the negligence of the tug or tugs, or of its or their officers and/or crews, and that the masters and crews of all such tugs shall, in the performance of such service or services, for said rates or other sums established by custom or contract, become and be the servants of said vessel, or craft, towed or handled in any way whatsoever and be identified therewith. It is hereby further agreed that this exception from liability for negligence applies, regardless of whether such vessel, or craft, so towed, assist in the service with its own steam, or in any way, and irrespective of whether any employee of this company, or the master, or any of the crew of the tug, is, at the time of said service, aboard of said vessel or craft, or is in command thereof. It is expressly understood and agreed that the foregoing does not apply to any salvage service, and that the said relation, of master and servant, does not exist, if begun, automatically ceases, in any service, by said tugs and/or their masters and/or their crews, which, at any time, saves, assists, or protects said vessel, or craft, from peril or impending danger."
Trosdal, Plant & Lafonta knew of this notice being a part of the tariff. Libelee claims relief from liability by reason of this condition of the tariff, independent of all other facts. Libelant claims that this notice did not constitute part of the contract, and, even if it did, it is invalid, as being contrary to public policy.
1. Was there a contract for docking made, and, if so, did the notice contained in the tariff become a part thereof? Capt. Kashiwa declares that he did not make any contract. If he actively adopted the contract, or alleged contract, already made by Trosdal, Plant & Lafonta, he, of course, must adopt it as it was. The question here is whether there was a contract made in behalf of the vessel for docking, and, if so, by whom and with what authority.
Libelant seems to contend that whatever contract was made was by Capt. Kashiwa, and that there is not to be imputed to him the knowledge of Trosdal, Plant & Lafonta as to the exemption contained in the tariff. As sustaining this contention, the facts that Trosdal, Plant & Lafonta were stockholders of the Atlantic Towing Company, and Mr. Bacon, the manager of Trosdal, Plant & Lafonta, was a director of the towing company, were stressed, and it is claimed that the principle of law applicable is that, because these agents would profit by the contract of docking that therefore any knowledge they had could not be imputed to the principal, and the following authorities, among others, are cited to sustain this contention: 2 C. J. pp. 694, 863; Benedict v. Arnoux, 154 N. Y. 715, 49 N. E. 326; Thomson Elec. Co. v. Capitol Elec. Co. (C. C.) 56 F. 849; Glover v. Ames (C. C.) 8 F. 351; City of Findlay v. Pertz, 66 F. 427, 13 C. C. A. 559, 29 L. R. A. 188; Davis Iron Co. v. Davis Wrought Iron Co. (C. C.) 20 F. 699; Pine, etc., Coal Co. v. Bailey, 94 F. 258, 36 C. C. A. 229; Waite v. City of Santa Cruz (C. C.) 89 F. 619; Alger v. Keith, 105 F. 105, 44 C. C. A. 371; Life Ins. Co. v. Robinson, 148 F. 358, 78 C. C. A. 268, 8 L. R. A. (N. S.) 883; Central Coal, etc., Co. v. Good & Co., 120 F. 793, 57 C. C. A. 161; Interstate Bank v. Yates Bank, 245 F. 294, 157 C. C. A. 486; Mobile, etc., Co. v. Sugar Products Co. (D. C.) 256 F. 392; Insurance Co. v. Hilton-Green, 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202; Bank of Overton v. Thompson, 118 F. 798, 56 C. C. A. 554.
A review of these authorities discloses that in some instances they are inapplicable, and that the principle sustained by them as applicable to the argument of libelant is, as stated by the Fifth Circuit Court of Appeals in Union Central Life Ins. Co. v. Robinson, supra: "While it is the general rule that notice to an agent of any matter connected *170 with the agency is notice to the principal, such rule has no application to a case where the agent at the time he receives such notice is acting for himself, in his own interest, adversely to the interest of his principal, and the communication of the notice to the principal would be contrary to his interest."
In this case there is no evidence that there was any action on the part of Trosdal, Plant & Lafonta, or of Mr. Bacon, in their own interest, and that was contrary to the interest of their principal. There was no other company than the Atlantic Towing Company engaged at Savannah in docking large ships, and that company made contracts only according to its tariff, in which was included such exemption. Had Trosdal, Plant & Lafonta not made this contract of docking, it does not appear that they could have made any. It is clear that Capt. Kashiwa did not make the contract, because he admits that he did not know where he was to dock, and expected that arrangements for his docking would already have been made by the ship's agent. He merely accepted what was offered; the letter from Suzuki & Co. to him, together with the letter from Trosdal, Plant & Lafonta, confirming that Capt. Nicolich had the authority to assist in the docking. The contract was made by Trosdal, Plant & Lafonta, and the question of imputed knowledge is not in this case.
Whatever may have been the customary relationship between the owner of the vessel and Suzuki & Co., Limited, the facts force the conclusion that in this case Suzuki & Co. were engaged in making contracts for the operation of the vessel while coming into the harbor of Savannah and being docked, or the vessel was being left without any operating authority. Even though it may be credited that no prior authority had been granted to Suzuki & Co. thus to arrange for the operation of the vessel, certain it is that there is everything to confirm the belief that such action on their part was ratified by the owner. The conclusion is therefore reached that Suzuki & Co., Limited, had the authority to employ Trosdal, Plant & Lafonta as agents for the ship, and that this authority comprehended docking, and that the letter from Trosdal, Plant & Lafonta to the harbor master, of which a copy was sent to Capt. Spencer, the manager of the Atlantic Towing Company, coupled with the testimony of Capt. Spencer that this was the usual way of making the contract, was sufficient to make a binding contract. This contract, thus made, was with the knowledge on the part of Trosdal, Plant & Lafonta, as agents of the steamer, that the exemption from negligence as contained in the aforesaid notice would and did become a part of such contract.
2. Was the contract of exemption from liability for negligence valid? Libelant insists that a negative answer to this question is furnished by the Supreme Court of the United States in the case of The Syracuse, 79 U. S. (12 Wall.) 167, 20 L. Ed. 382, and the following cases are cited as having held that such was the ruling of the United States Supreme Court in The Syracuse, and as having followed this case: The Rescue (D. C.) 24 F. 190; The American Eagle (D. C.) 54 F. 1010; The Jonty Jenks (D. C.) 54 F. 1021; In re Moran (D. C.) 120 F. 557; The Somers N. Smith (D. C.) 120 F. 569; The Temple Emery (D. C.) 122 F. 180; Alaska Commercial Co. v. Williams, 128 F. 362, 63 C. C. A. 92; The Edmund L. Levy, 128 F. 684, 63 C. C. A. 235; Winslow v. Thompson, 134 F. 546, 67 C. C. A. 470. The Syracuse has never been affirmed, or overruled, or criticized, by the Supreme Court since its rendition, December, 1870.
An affirmative answer to the above question is furnished by the Circuit Court of Appeals of the Second Circuit, in 1909, in The Oceanica, 170 F. 893, 96 C. C. A. 69. This case discusses the Syracuse, and reaches the conclusion that the decision in The Syracuse did not mean what is claimed by libelant here. A petition for certiorari was denied by the Supreme Court in the Oceanica. The rule laid down in the Oceanica has been followed in the Second Circuit in Monk v. Steamboat Co., 198 F. 472, 117 C. C. A. 232, and Ten Eyck v. Director General of Railroads (C. C. A.) 267 F. 974 (certiorari denied 254 U. S. 646, 41 S. Ct. 14, 65 L. Ed. 455), and in other District Courts of the Second Circuit.
In Mylroie v. British Columbia Mills Tug & Barge Co., 268 F. 449 (1920), the Circuit Court of Appeals for the Ninth Circuit expressly refused to follow The Oceanica, and concluded that The Syracuse had the meaning claimed by libelant and was controlling. Petition for certiorari was granted in the Mylroie Case (255 U. S. 566, 41 S. Ct. 322, 65 L. Ed. 789), and the judgment of the Circuit Court of Appeals was affirmed (259 U. S. 1, 42 S. Ct. 430, 66 L. Ed. 807). This question, however, was not decided. The Supreme Court interpreted the contract involved as meaning "that the tug was not to be held liable for any damage which might happen to the barge or its cargo, while in *171 tow, unless the tug should not render reasonable assistance to the tow in an emergency," and held that the tug did not render the assistance as required by the contract, and then states: "This makes it unnecessary for us to consider the contention on behalf of the barge that the exemption clause is void."
Study of the cases cited by libelant justifies the conclusion that The Syracuse controlled the respective courts which decided that an exemption from liability for negligence on the part of the tug was invalid. It is important, therefore, to determine whether or not The Syracuse did decide this question, and, if not, whether there be any sufficient reason, independent of a decision by the Supreme Court, or other controlling court, why this court should decide that such provision in the contract is invalid.
The following sentence appears in the opinion in The Syracuse: "Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require, on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences." The tow was being conducted under a contract which provided that the barge was towed "at the risk of her master and owners."
Libelant insists that this declaration in the opinion decides that such provision in the contract was invalid. Such is not the opinion of this court. There were two possible liabilities on the part of the tug: (1) That it should be responsible for all risks of navigation, whether arising from the negligence of the tug or otherwise; and (2) that it should be responsible for disaster flowing from its negligence. Admittedly there was no definite provision exempting from liability for negligence of the tug. The record discloses that counsel for appellant  that is, the Syracuse  made no urge that this contract exempted the Syracuse from liability for its negligence. The statement in the brief of counsel for the Syracuse is illuminating. It is as follows: "The boat was towed `at the risk of her master and owners'; that is to say, under a contract on the part of the libelant that he would bear the risks of the navigation, provided the steamboat which furnished the propulsive power was navigated with ordinary care and skill. Any other construction of the rights of the parties would deprive that clause of the contract of meaning and make it a snare."
It is also instructive that the answer of the libelee, the Syracuse, made no claim of exemption from liability for negligence. Apparently the only question argued, and the only question decided, was as to whether the Syracuse was negligent in not dividing the tow at Thirteenth street, New York. If libelee, the Syracuse, claimed no exemption from negligence under this contract, either in its answer or in its argument, how can it be that such was an issue before the Supreme Court. Is it not true that the Supreme Court makes no stronger statement of the duty of the Syracuse than does the counsel for the Syracuse? In both cases, were not the minds of the authors enunciating a principle applicable solely to the question as to whether the failure to divide the tow at Thirteenth street was a compliance with the recognized duty upon the Syracuse? Neither was considering what the contract meant, or whether or not it was valid. There was no question as to its validity, covering a loss not involved in the diligence owing from the Syracuse, and there was no effort on the part of the Syracuse to escape liability by reason of such contract for any loss which was caused by its negligence.
If the portion of the opinion in the Syracuse relied on by libelant meant what libelant claims, it was obiter. An application of the principles of obiter dictum to the above facts will sustain this statement. What is obiter dictum? "An opinion expressed by a court upon some question of law which is not necessary to the decision of the case before it." Bouvier's Law Dictionary, Third Revision, p. 863. The doctrines of stare decisis and obiter dictum are thus discussed in Carroll v. Lessee of Carroll, 57 U. S. (16 How.) 286, 287, 14 L. Ed. 936:
"If the construction put by the court of a state upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so, there must have been an application of the judicial mind to the precise question necessary to be determined to fix the rights of the parties and decide to whom the property in contestation belongs. And therefore this court, and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In Cohens v. State of Virginia, 6 Wheat. 399 [5 L. Ed. 257] this *172 court was much pressed with some portion of its opinion in the case of Marbury v. Madison [1 Cranch, 137, 2 L. Ed. 60], and Mr. Chief Justice Marshall said: `It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent; other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.'"
This doctrine has stood unmodified by the Supreme Court of the United States, except as stated in the two following cases:
Railroad Co. v. Schutte, 103 U. S. 118, 26 L. Ed. 327 (headnote 7): "It cannot be said that a case is not authority on one point, because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter."
And Union Pac. R. Co. v. Railroad Co., 199 U. S. 160, 26 S. Ct. 19, 50 L. Ed. 134 (headnote 1): "A distinct ruling on any question fairly arising in a trial is not obiter dictum, and where the judgment rests upon two grounds, either being sufficient to sustain it, and the appellate court sustains it on both grounds, the ruling on neither is obiter, but each is the ruling of the court and of equal validity with the other."
In The Syracuse the decision as to the validity of a contract exempting from liability for damages caused by negligence was not necessary to the decision of the case, that point was not "presented and decided," and that is not the "ground" upon which the decision was founded.
Libelant urges that, because The Syracuse has been followed by so many courts, as having the meaning contended for by it, and having thus stood for more than 50 years, it is satisfied that the Supreme Court was content with the meaning given to such decision. Libelant disposes of the fact that a petition for certiorari was denied in The Oceanica by the statement, well sustained by authority, that a denial of a petition for certiorari is not indicative of an affirmance by the Supreme Court of the opinion of the lower court (United States v. Carver, 260 U. S. 482, 490, 43 S. Ct. 181, 67 L. Ed. 361), and that the failure of the Supreme Court to decide this particular question in the Mylroie Case was further indicative of that court's being satisfied with the decision in The Syracuse. On the other hand the libelee here strongly urges, and with compelling influence, the view that, if the Supreme Court, when it had under consideration the Mylroie Case, had been satisfied that this particular question had been decided in The Syracuse, it would inevitably have disposed of the question, not by declaring, "This makes it unnecessary for us to consider the contention on behalf of the barge that the exemption clause is void," but by stating that the question has been settled since the decision in The Syracuse. This court, therefore, is left without any controlling authority to decide whether the contract exempting the tug from liability for negligence is valid, or, to put it otherwise, whether such contract is against public policy.
All parties agree that a tug engaged in towing is not a common carrier. There is no suggestion that there should be a different measure of duty upon tugs engaged in harbors than on tugs or steamers engaged in towing elsewhere. It is important that this should be realized. It is undenied in this case that at the port of Savannah the Atlantic Towing Company was the only company or person engaged in towing large ships, that it had but one tariff, and that this tariff contained the exemption clause under consideration. It follows, therefore, that any large vessel coming into the harbor of Savannah and desiring assistance from a tug in towing has no choice as to what towing company it will employ. This tends to cause the contemplation of the towing company as in the nature of a common carrier. It must not be forgotten, however, that there is neither law nor custom that forbids the engaging in the business of towing at Savannah by as many tug companies as may desire. Further, it must not be forgotten that the towing company has a right to measure, not only the cost of its services and what is a reasonable profit thereon, but also the risks, though small, of large losses that may arise from the handling of large vessels, and that it may be unwilling to assume any risk of such large losses, and to conclude that it could not render such services for so small a price as now charged, or at any price.
The question of the right of a towboat to exempt itself from liability for negligence has been a subject in the minds of lawyers and the operators of such boats for many *173 years. Certainly since 1909 in this country there has been a decision of the Circuit Court of Appeals of the Second Circuit, in The Oceanica, that such a contract was valid. It must not be forgotten that neither Congress nor the state of Georgia has during that period enacted any measure prohibiting such a contract. Is not this significant? Is this court justified in declaring a public policy which the state and Congress have by inaction negatived for certainly 16 years?
Contracts of like nature have been upheld. See cases cited in The Oceanica, 170 F. 895, 96 C. C. A. 69. Common carriers cannot contract against their liability for negligence. Railroad Co. v. Burke, 255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656. Even in the case of a common carrier, a contract limiting the amount of liability by fixing the maximum value of the property shipped has been upheld. Reid v. Express Co., 241 U. S. 544, 36 S. Ct. 712, 60 L. Ed. 1156. The inability to limit its liability is distinguishing of a common carrier, and is against the declared public policy of the country.
If such policy be declared as binding upon tug companies, thus taking from them the liberty of contract, it may well be that the increased rates for service will be so great as to severely impair the commerce of the country. If this right of contract be denied as applicable to large vessels, it is also applicable to barges. If denied as to services in harbors, it equally must be denied as to services in rivers or on the high seas. So far as is disclosed, the contracts containing such exemptions have worked satisfactorily in the commerce of the country for many years, and this court would be bold indeed to declare such a practice against public policy, in the face of such record and of the inaction of the states and of the Congress. The contract of exemption from liability is valid. There was no need to offer an alternative contract at a different rate. Such requirement would violate the freedom of contract.
3. Libelant contends that, because the libel is brought ex delicto, rather than ex contractu, therefore this exemption in the contract is not enforceable. As stated by counsel for libelee: "This is a novel idea, that the libelant can destroy a contract by the form in which it elects to bring its action." In principle this question is discussed, on rehearing, in The Oceanica, 170 F. 897, 96 C. C. A. 69 et seq., and a conclusion is reached adverse to the contention of libelant, in which this court concurs.
4. If the conclusion of the court that the contract exempting the towing company from liability for negligence be sound, the case is concluded, for it rests wholly upon the claim of negligence on the part of the towboat company or its employees. It would not be profitable to undertake to discuss in detail the conflicting testimony in this case, for unquestionably it does conflict in a number of important particulars  the time, the draft, the depths, the forces necessary to be employed, the proper navigation of the ship, the respective duties of the captains of the vessel and of the tugs, what should or should not have been foreseen, the placing of the tugs, and the time of the commencement of work by the tugs in helping the vessel. It does seem proper, however, in view of the protracted study that the court has given to the testimony and to the thorough briefs in this case, that his conclusions should be stated.
Both sides agree that the burden is upon the libelant to prove its case, and that the duty of the libelee is not that of a common carrier, but to exercise the skill and diligence that a skillful mariner would exercise under like circumstances; the libelee not being responsible for errors in judgment, if such errors did not in themselves constitute negligence. It is true that the libelant contends that certain facts in this case, when proven, are in the nature of res ipsa loquitur, and sufficient to place upon the libelee the burden of showing that diligence was exercised. The court, not being a mariner, and not versed in the duties of towing and in the effective forces of machinery, cannot be certain of its conclusion, but it is impressed with the fact that the criticisms leveled at the captain of the towboat are cases of hindsight, rather than foresight. The proper way to measure the diligence and the skill is, as far as possible, to visualize the conditions as they then existed, as to time, speed, and surrounding conditions of all kinds. To illustrate: How easy is it to say, after the accident, that Capt. Nicolich, upon discovering the impracticability of his docking the steamer in slip No. 3 of the Seaboard Air Line wharf, should then have backed down to the Atlantic Coast Line wharf, whether it was nearly opposite to the steamer at the time, or whether it was some three-quarters of a mile down the river, according to the testimony of some of the witnesses.
There is evidence to show that there was more water at the Atlantic Coast Line wharf than at the Seaboard wharf, but the force of that is overturned by the testimony that at the time the measurements were taken by *174 the witnesses as to the water at the Coast Line there had been a dredging subsequent to August 11, 1923, and the great preponderance of the testimony is to the effect that there was more water at and near the Seaboard wharf than at and near the Coast Line wharf. Can it be reasonably doubted that, if an effort had been made to carry this vessel to the Coast Line wharf, where it was admitted it could not, under the most favoring witness, approach nearer than 25 feet, and had been injured, or had there done injury, Capt. Nicolich would have been charged with negligence in violating his duty, when he had been instructed to dock at the Seaboard Air Line wharf? Can it be doubted that if, when the vessel first grounded, he had rested content without further effort, and that thereafter the swinging across the channel, similar to that which ultimately occurred, had occurred, he would have been criticized for not making the effort to get to the wharf, especially in view of the fact that there is ample testimony to show that there are bumps on the bottom of the river and shifting conditions, and that where the vessel first struck might have been a bump, and that there was probably ample water to accommodate the vessel by backing and then coming forward to reach the wharf, if the draft was as he claims was represented to him?
My conclusions as to the facts, briefly stated, are as follows:
(1) The perilous position in which the Pacific Maru was when Capt. Nicolich took charge was in no way the fault of the towing company.
(2) Capt. Nicolich was justified in relying upon the statement of Capt. Kashiwa, whether made either directly to him or to the pilot, who repeated it to him, as to the draft of the vessel, and it was not obligatory on him in any way to take the measure of the draft of the vessel while it was progressing upstream, and while he was engaged in the apparently difficult effort of boarding the Pacific Maru.
(3) If the draft of the vessel, as stated by Capt. Kashiwa to the pilot, was correct, there was no lack of diligence on the part of Capt. Nicolich to attempt to bring the vessel to berth 32 of the Seaboard Air Line wharf.
(4) Capt. Nicolich was justified in believing that the extreme draft, and not the mean draft, was meant when he inquired of the draft. The danger point was not the mean draft, but the extreme draft.
(5) Capt. Nicolich was justified in the movement of backing the vessel from where it first grounded.
(6) It is not my understanding that Capt. Nicolich attempted to move the Pacific Maru from her position where she was grounded at 4:15 p. m. on August 11, 1923, instead of waiting for highwater at 8 p. m., but that he had the tugs there and in operation to interfere and prevent the swinging of the stern to port in the event that the stern should become afloat before the bow. The alternative of this would seem to be, according to libelant, that the tug should have done nothing until the vessel was afloat, and yet no one questions that when it did become afloat, and was drifting with its stern afloat, neither two tugs, nor many tugs, could probably have held the vessel parallel to the shores. There was no error in this action of Capt. Nicolich.
(7) In view of the facts as to the failure on the part of the vessel and its agents to ask for more tugs, the lack of knowledge on the part of any one as to just how the Pacific Maru was grounded, as to whether or not the vessel would float all at once, or remain imbedded by the stem, and the unavailability of any other tug of the towing company, unless it be the Cambria, and of the seemingly uncontradicted opinion that not ten tugs could have held the vessel, floating as she did first with her stern, and the bow not becoming loosed until the vessel was almost at right angles to the stream, I cannot hold that Capt. Nicolich or the towing company was negligent in providing only two tugs.
(8) There was no negligence in the way the tugs Leon and McCauley were attached. In consonance with the above I do not find that there was lack of diligence on the part of the towing company in failing to hold the Pacific Maru, and prevent her stern from swinging aport and going aground on well-known and charted shores.
(9) It is readily understandable that there was a misunderstanding between Capt. Nicolich and Capt. Kashiwa as to the hawsers and cables suitable for attaching the stern to the Seaboard Air Line wharf. The evidence does not convince as to whether this would or would not have held, or whether or not it was the proper course. I am not prepared to say that it was the duty of Capt. Nicolich, rather than the duty of Capt. Kashiwa, to employ this method. It must be remembered that the towing company was not responsible for the perilous condition of the Pacific Maru shortly before she grounded, *175 and that the towing company and its officers were not negligent in attempting the movement during which she was grounded.
(10) It can be readily surmised, but certainly there is not sufficient evidence to warrant a definite conclusion as to the sinking of the bow after the accident by the loss of the five-ton metal piece from the stern, from the shifting of the cargo, and from water in the ballast tank. It does not seem reasonable that the shifting of the cargo was caused by this grounding, which no evidence discloses produced any considerable shock, and there is no evidence that any quantity of water entered the ballast tank. Any finding that might be made as to the effect of any or all of these on the draft would be a pure guess.
A decree in favor of the libelee will be taken in accordance with the foregoing findings.